ARTHUR C. HAWKINS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

GLENDA R. HAWKINS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 30310–91, 28446–92.    Filed January 27, 1994.

*John E. Heer III* and *Douglas G. Schneebeck*, for petitioner in docket No. 30310–91.

*Tracy J. Ahr* and *Patricia Tucker*, for petitioner in docket No. 28446–92.

*Thomas F. Eagan*, for respondent.

### OPINION

COHEN, *Judge*: Respondent determined deficiencies in petitioners' 1987 Federal income tax of $384,792 for Arthur C. Hawkins (Dr. Hawkins) and $377,573 for Glenda R. Hawkins (Mrs. Hawkins). These deficiencies stem from payments made to Mrs. Hawkins from the Arthur C. Hawkins, D.D.S., P.A. Pension Plan (pension plan), in connection with her divorce from Dr. Hawkins. These consolidated cases are before the Court on the parties' cross-motions for summary judgment. The issues for decision are:

(1) Whether collateral estoppel precludes Dr. Hawkins' claim that the marital settlement agreement satisfies the requirements of section 414(p);

(2) whether the language in petitioners' marital settlement agreement satisfies the requirements of section 414(p) so that it is a qualified domestic relations order (QDRO); and

(3) whether evidence of petitioners' intent should be considered.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The parties filed stipulations of facts for the purpose of their cross-motions for summary judgment. The stipulations of facts are incorporated herein by this reference. The facts underlying the parties' motions are not in dispute. Because the motions for summary judgment were filed too late to process an opinion prior to the date of trial, we received evidence proffered by Mrs. Hawkins regarding the intent of petitioners over the objection of Dr. Hawkins. However, we assume the facts described below based on the pleadings, the stipulations, and other pertinent materials in the record without reference to the proffered evidence of petitioners' intent. Rule 121(b).

*Undisputed Facts*

Petitioners were married on July 17, 1965, and were divorced on January 7, 1987. At the time the petitions were filed, petitioners resided in Albuquerque, New Mexico.

Dr. Hawkins, an orthodontist, was the president and sole shareholder of Arthur C. Hawkins, D.D.S., P.A. On July 22, 1972, Dr. Hawkins established the pension plan, of which he was the sole trustee. As of July 31, 1986, the value of Dr. Hawkins' accrued benefit under the pension plan was $1,072,932.97.

On January 5, 1987, petitioners entered into a marital settlement agreement as part of a divorce proceeding that was filed in the Second Judicial District Court, County of Bernalillo, State of New Mexico. The judgment and final decree of dissolution of marriage incorporated by reference the provisions of the marital settlement agreement.

Paragraph 6 of the marital settlement agreement provided:

6. WIFE'S COMMUNITY PROPERTY: As a compromise distribution of the community property, Wife shall receive as her separate property:

a) Cash of One Million Dollars ($1,000,000) from Husband's share of the Arthur C. Hawkins, DDS Pension Plan. The down payment of One Thousand Two Hundred Dollars ($1,200) made for Wife's condominium shall be a part of the $1,000,000. This represents a community distribution;

Paragraph 9 of the marital settlement agreement provided:

9. WIFE'S COMMUNITY DEBTS: Wife assumes, shall timely pay and shall hold Husband harmless for the following debts:

a) One-half the income tax obligation incurred on community income for the tax year of the dissolution of marriage as is more fully set out in Paragraph 11.;

b) Notwithstanding the provisions of paragraph 9.a), the tax obligation * * * [on] any asset or proceeds which she is receiving pursuant to this Agreement;

The cash of $1 million referred to in the marital settlement agreement was paid to Mrs. Hawkins in installments between January 7, 1987, and March 16, 1987, by checks written on the Arthur C. Hawkins, D.D.S., P.A. Pension Trust bank account. Upon receipt of the $1 million paid to her from the pension plan, Mrs. Hawkins paid $16,200 to Dr. Hawkins, individually, in repayment of funds advanced to her by Dr. Hawkins, individually, during 1986.

On January 31, 1988, Form 1099–R, reflecting ordinary income of $1 million, was mailed to Mrs. Hawkins. On March 31, 1988, a "corrected" Form 1099–R, reflecting ordinary income of zero, was mailed to Mrs. Hawkins.

On March 31, 1989, Dr. Hawkins filed a motion for entry of qualified domestic relations order nunc pro tunc and for judgment enforcing the judgment and final decree of dissolution of marriage in the Second Judicial District Court, County of Bernalillo, State of New Mexico. In that motion, Dr. Hawkins alleged that the $1 million received by Mrs. Hawkins was an asset or proceeds that she received pursuant to the marital settlement agreement and, therefore, that, under the terms of the marital settlement agreement, she was obligated to pay the taxes on the $1 million distribution. Dr. Hawkins further asserted that Mrs. Hawkins refused to pay the income taxes on the $1 million and that she refused to sign a QDRO recognizing her interest in the pension plan and her obligation to pay the income taxes resulting from the distribution. Dr. Hawkins also stated in the motion that he had to transfer funds from other investments into the pension plan as reimbursement of the cash paid to Mrs. Haw-

kins in order to conform with Internal Revenue Service (IRS) regulations.

Based on these allegations, Dr. Hawkins requested the court to order Mrs. Hawkins to pay to him an amount equal to the income taxes and penalties that would be due upon distribution of $1 million from the pension plan. Alternatively, Dr. Hawkins requested that the court either order Mrs. Hawkins to sign a QDRO or enter a QDRO nunc pro tunc to the date of divorce without Mrs. Hawkins' approval. Dr. Hawkins attached a copy of a proposed QDRO to his motion. This proposed QDRO clearly set forth the last known address of petitioners, designated Mrs. Hawkins as the "alternate payee", and expressly created and recognized the alternate payee's right to a $1 million interest in Dr. Hawkins' interest in the pension plan.

Mrs. Hawkins filed a response to Dr. Hawkins' motion denying that she was liable for the income taxes resulting from the pension plan distribution. Mrs. Hawkins asserted that she agreed to assume the tax consequences and liabilities resulting from her subsequent management of the money and property received in the agreement, but not responsibility for the taxes resulting from the "creation" of such money and property. Mrs. Hawkins also denied that the marital settlement agreement provided for the preparation of a QDRO and that she was designated as the "alternate payee". Mrs. Hawkins contended that, under the terms of the marital settlement agreement, Dr. Hawkins owed her $1 million and that Dr. Hawkins satisfied this obligation by borrowing money from the pension fund.

On August 2, 1989, the Second Judicial District Court, County of Bernalillo, State of New Mexico, denied Dr. Hawkins' motion. The court found:

4. Nothing in the Marital Settlement Agreement or the 7 January 1987 Final Decree incorporating the Final Decree specifies that a Qualified Domestic Relations Order is or will be created, or that * * * [Mrs. Hawkins] is an "alternate distributee" of the Arthur C. Hawkins DDS Pension Plan.

5. Nothing in the Marital Settlement Agreement or the 7 January 1987 Final Decree incorporating the Final Decree specifies that * * * [Mrs. Hawkins] is responsible for any taxes or penalties on the SOURCE of the $1,000,000 she received as part of the COMMUNITY assets she received as part of the distribution of the COMMUNITY at or after the time of entry of the Final Decree. (She is responsible for ". . . the tax obligation

on any *asset or proceeds* which she is receiving pursuant to [the Marital Settlement] Agreement.") * * *

6. The Marital Settlement Agreement and Final Decree are clear and unambiguous regarding the above provisions.

7. The Court did not reserve any jurisdiction on any issue, except its continuing statutory jurisdiction to ENFORCE the provisions of the Final Decree and Marital Settlement Agreement, and its jurisdiction to modify child custody, child support, and visitation issues. Therefore, the Court's jurisdiction to amend or modify the Final Decree and Marital Settlement * * * expired 30 days after January 7, 1987 * * *

The court further stated that, as of August 2, 1989, IRS had not determined deficiencies resulting from the distribution for either Dr. or Mrs. Hawkins and thus that the issue of enforcement of the marital settlement agreement was not ripe. The court also stated that, because a corrected Form 1099–R had been issued to Mrs. Hawkins, the issue of enforcement of the tax liability provisions of the marital settlement agreement was either moot or not ripe.

In its conclusion, the New Mexico court used the following language to deny Dr. Hawkins' motion:

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

A. * * * [Dr. Hawkins'] Motion for Entry of a Qualified Domestic Relations Order is DENIED, and DENIED FOR LACK OF JURISDICTION.

B. * * * [Dr. Hawkins'] Motion asking the Court to find that * * * [Mrs. Hawkins] is an alternate distributee of the Arthur C. Hawkins, DDS Pension Plan is DENIED, and DENIED FOR LACK OF JURISDICTION.

C. * * * [Dr. Hawkins'] Motion to Enforce the Final Decree and its incorporated Marital Settlement Agreement regarding obligation for payment of taxes on the $1,000,000 COMMUNITY PROPERTY which Petitioner received as her share of the COMMUNITY is DENIED BECAUSE OF MOOTNESS, and/or ABSENCE OF RIPENESS.

On February 2, 1991, a "revised corrected" Form 1099–R, reflecting ordinary income of $1 million, was mailed to Mrs. Hawkins. Neither petitioner included the $1 million distribution on his or her 1987 income tax return.

## Discussion

Resolution of the issue of whether the marital settlement agreement is a QDRO will determine which petitioner is responsible for the income tax resulting from the pension plan distribution. A distribution from a qualified plan is generally taxed to the distributee in the year distributed. While

neither the Code nor the regulations define the term "distributee" as used in section 402(a)(1), the general rule is that the distributee of a plan distribution is the participant or beneficiary who, under the plan, is entitled to receive the distribution. *Darby v. Commissioner*, 97 T.C. 51, 58 (1991). Section 402(a)(9), however, provides an exception to this general rule.

Section 402(a)(9), as amended by the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085, provides that an alternate payee, who is the spouse or former spouse of the plan participant, shall be treated as the distributee of any distribution or payment made to the alternate payee under a QDRO. Therefore, a distribution made to such an alternate payee under a QDRO will be taxable to that alternate payee, and not to the plan participant, because section 402(a)(9) treats the alternate payee as the distributee.

Dr. Hawkins contends that Mrs. Hawkins is the alternate payee under a QDRO and, thus, that she is treated as the distributee of the pension plan distribution under section 402(a)(9). As a result, Dr. Hawkins maintains that the distribution from the pension plan is includable in Mrs. Hawkins' income, and not in his.

Section 414(p)(8) defines the term "alternate payee" as "any spouse, former spouse, child or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant."

Section 414(p) provides in part:

SEC. 414(p). QUALIFIED DOMESTIC RELATIONS ORDER DEFINED.—For purposes of this subsection and section 401(a)(13)—

(1) IN GENERAL.—

(A) QUALIFIED DOMESTIC RELATIONS ORDER.—The term "qualified domestic relations order" means a domestic relations order—

(i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(ii) with respect to which the requirements of paragraphs (2) and (3) are met.

(B) DOMESTIC RELATIONS ORDER.—The term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—

(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(ii) is made pursuant to a State domestic relations law (including a community property law).

(2) ORDER MUST *clearly specify* CERTAIN FACTS.—A domestic relations order meets the requirements of this paragraph only if such order clearly specifies—

(A) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternative payee covered by the order,

(B) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(C) the number of payments or period to which such order applies, and

(D) each plan to which such order applies.

(3) ORDER MAY NOT ALTER AMOUNT, FORM, ETC., OF BENEFITS.—A domestic relations order meets the requirements of this paragraph only if such order—

(A) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(B) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(C) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

\*   \*   \*   \*   \*   \*   \*

(6) PLAN PROCEDURES WITH RESPECT TO ORDERS.—

(A) NOTICE AND DETERMINATION BY ADMINISTRATOR.—In the case of any domestic relations order received by a plan—

(i) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

(ii) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

[Emphasis added.]

Respondent maintains that, under sections 414(p)(12) and 401(n), the administrative and interpretive jurisdiction with respect to the section 414(p) issue lies with the Department of Labor, which has not yet stated its position on this matter. As a result, respondent has not taken a position on whether petitioners' marital settlement agreement meets the require-

ments of section 414(p), nor has respondent addressed the issue of the admissibility of the parol evidence offered by petitioners. Instead, respondent asserts in her brief that, upon our resolution of the QDRO issue, judgment should be in favor of respondent and against one petitioner and should be against respondent and in favor of the other petitioner.

## Collateral Estoppel

Respondent and Mrs. Hawkins contend that collateral estoppel precludes Dr. Hawkins' contention that the marital settlement agreement constitutes a QDRO. Under the doctrine of collateral estoppel, a judgment in a prior suit precludes, in a different cause of action, litigation of issues actually and necessarily determined in the previous suit. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979); *Meier v. Commissioner*, 91 T.C. 273, 282 (1988). Traditionally, the scope of collateral estoppel was limited to prior judgments between the same parties. *Parklane Hosiery Co. v. Shore, supra* at 326–327. However, in *Parklane*, the Supreme Court abandoned the requirement of mutuality and sanctioned the use of offensive and defensive collateral estoppel. As a result, respondent may assert collateral estoppel even though respondent was not a party to the proceeding in the New Mexico district court.

The parties agree that the cases here involve a cause of action different from the one involved in the New Mexico district court. The parties disagree, however, as to whether the issues in question here were actually and necessarily determined in the proceeding in the New Mexico district court. The ultimate issue here is whether the language in the marital settlement agreement satisfies the requirements of section 414(p) so that the agreement itself is a QDRO.

Respondent and Mrs. Hawkins contend that, in denying Dr. Hawkins' motion for entry of qualified domestic relations order nunc pro tunc and for judgment enforcing the judgment and final decree of dissolution of marriage, the New Mexico district court actually and necessarily decided that the marital settlement agreement did not constitute a QDRO.

The New Mexico Supreme Court has stated that the term "nunc pro tunc" refers to:

the making of an entry now, *of something which was actually previously done*, so as to have it effective as of the earlier date. It is not to be used to supply some omitted action of the court or counsel, but may be utilized to supply an omission in the record of something really done but omitted through mistake or inadvertence. * * * [*Mora v. Martinez*, 451 P.2d 992, 993 (N.M. 1969).]

Thus, respondent and Mrs. Hawkins contend that, by making a motion for entry of qualified domestic relations order nunc pro tunc, Dr. Hawkins was asking the New Mexico district court to enforce the marital settlement agreement by entering a QDRO, thereby formalizing something previously accomplished or contemplated. Respondent and Mrs. Hawkins interpret the statement in the order of the New Mexico district court that the "Motion for Entry of a Qualified Domestic Relations Order is DENIED, and DENIED FOR LACK OF JURISDICTION" as meaning that the court denied, on the merits, the motion to enforce the marital settlement agreement as a QDRO while separately ruling that the court did not have jurisdiction to amend or modify the marital settlement agreement so as to create a QDRO. Thus, respondent and Mrs. Hawkins contend that, by denying the motion to enforce the marital settlement agreement as a QDRO nunc pro tunc, while additionally ruling that the court did not have jurisdiction to amend or modify the marital settlement agreement so as to create a QDRO, the New Mexico district court actually and necessarily decided that the marital settlement agreement did not constitute or contemplate a QDRO.

While conceding that the New Mexico district court had jurisdiction to determine whether the marital settlement agreement constituted a QDRO, Dr. Hawkins, citing *Las Vegas v. Oman*, 796 P.2d 1121, 1128 (N.M. Ct. App. 1990), contends that collateral estoppel does not apply here because the prior case was determined alternatively on its merits and on the ground of lack of jurisdiction.

In the New Mexico district court's specific findings of fact, the court was addressing three separate issues; namely, whether the marital settlement agreement was *intended* to be enforced as a QDRO and, if not, whether the court could amend the agreement so as to create a QDRO and, finally, how the court should enforce the tax liability provisions of the marital settlement agreement. Dr. Hawkins' motion was "DENIED" with respect to the intended QDRO enforcement

issue, was "DENIED FOR LACK OF JURISDICTION" with respect to the modification issue, and was "DENIED BECAUSE OF MOOTNESS, and/or ABSENCE OF RIPENESS" with respect to the enforcement of the tax liability provisions of the marital settlement agreement. Thus, it appears that the court decided the intended QDRO enforcement issue on the merits and the other issues on jurisdictional grounds.

We are not satisfied that, in ruling on the intended QDRO enforcement issue, the New Mexico district court "actually and necessarily" decided the ultimate issue in this case: the issue of whether the language in the marital settlement agreement satisfies the criteria of section 414(p) so that the agreement itself constitutes a QDRO. The order of the court made no mention of section 414(p) or the requirements listed in section 414(p)(2) and (3). The New Mexico district court, in exercising its enforcement jurisdiction over the marital settlement agreement, was attempting to ascertain petitioners' *intentions* as to the tax consequences of the $1 million distribution as expressed in their marital settlement agreement.

Where, as here, a statute allows parties to a marital settlement agreement to allocate the tax burdens between them by the use of particular language, the intentions of the parties are not controlling. See *Commissioner v. Lester*, 366 U.S. 299, 304–305 (1961), discussed further below. Compare *Beard v. Commissioner*, 77 T.C. 1275, 1284 (1981) with section 71. Because the New Mexico court's order decided intentions but not effect, it does not operate to collaterally estop Dr. Hawkins' claim in this case.

## QDRO Requirements

### Background

Prior to the enactment of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829, assignments of a participant's interest in a tax-qualified plan were not prohibited by the Internal Revenue Code. This permissible assignability was changed by section 401(a)(13)(A), which was added by ERISA section 1021(a), 88 Stat. 935, and which requires tax-qualified plans to provide "that benefits provided under the plan may not be assigned or alienated".

ERISA section 514(a), 29 U.S.C. sec. 1144(a) (1988), also provides that the labor title of ERISA preempts State law. After the enactment of ERISA, a divergence of opinion arose as to whether this preemption provision applied to prohibit the attachment or assignment of pension plan benefits under State community property and family support laws: For example, in *Stone v. Stone*, 632 F.2d 740 (9th Cir. 1980), the Court of Appeals for the Ninth Circuit held that ERISA was not intended to preempt community property laws so that a court-ordered division of retirement benefits did not violate the antiassignment provisions. In *Francis v. United Technologies Corp.*, 458 F. Supp. 84 (N.D. Cal. 1978), however, the court held that the preemption provision of ERISA prevented the application of State community property law permitting attachment of plan benefits for family support obligations.

To clarify the application of ERISA antialienation provisions to State family support and community property laws, Congress enacted the Retirement Equity Act of 1984 (REA), Pub. L. 98–397, 98 Stat. 1426. See S. Rept. 98–575, at 19 (1984), 1984–2 C.B. 447, 456. REA provided new rules for the treatment of certain domestic relations orders, requiring the distribution of all or a part of a participant's benefits under a qualified plan to an alternate payee. REA section 204(b), 98 Stat. 1445, added section 414(p), which defines a QDRO. Section 401(a)(13)(B) provides that the creation, recognition, or assignment of an alternate payee's right to plan benefits under a QDRO does not violate the antialienation provision of ERISA and section 401(a)(13)(A).

*Section 414(p) QDRO Requirements*

Dr. Hawkins maintains that the marital settlement agreement is a QDRO because it meets all of the requirements of section 414(p). Mrs. Hawkins does not contend that the marital settlement agreement alters the amount of plan benefits so as to violate section 414(p)(3). Instead, Mrs. Hawkins argues that the settlement agreement does not satisfy the requirements of section 414(p)(1)(A)(i) and (p)(2) and thus that it is not a QDRO.

Recently, in *Karem v. Commissioner*, 100 T.C. 521, 525–526 (1993), we held that a consent judgment of partition of

community property did not, itself, meet the requirements of section 414(p)(2). The consent judgment in that case specifically stated that a QDRO would be prepared by the former husband in a separate document. Here, we are squarely faced with the issue of whether certain language in the settlement agreement is sufficient to meet the requirements of section 414(p).

Section 414(p)(1)(A)(i) defines a QDRO as a domestic relations order that *"creates* or *recognizes* the existence of an alternate payee's right to, or *assigns to* an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan". (Emphasis added.) Section 414(p)(1)(B) states that a domestic relations order is "any judgment, decree, or order (including approval of a property settlement agreement) which—(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse * * * and (ii) is made pursuant to a State domestic relations law (including a community property law)." Mrs. Hawkins concedes that the marital settlement agreement is a domestic relations order. However, Mrs. Hawkins contends that the domestic relations order is not "qualified" because it does not "create" or "recognize" the existence of an "alternate payee's" right to, or "assign" to an "alternate payee" the right to, receive plan "benefits payable" to Dr. Hawkins as required by section 414(p)(1)(A)(i).

The marital settlement agreement stated that "As a compromise distribution of the community property, Wife shall receive as her separate property: a) *Cash* of One Million Dollars ($1,000,000) *from* Husband's share of the Arthur C. Hawkins, DDS Pension Plan." (Emphasis added.) Dr. Hawkins contends that this language satisfies section 414(p)(1)(A)(i) because the word "from" establishes Mrs. Hawkins' right to a portion of the plan benefits. Dr. Hawkins maintains that section 414(p)(1)(A)(i) does not require a "formal assignment" and that the requirements of section 414(p)(1)(A)(i) are more broadly worded than acknowledged by Mrs. Hawkins.

In arguing that we should not receive the evidence regarding intent offered by Mrs. Hawkins, Dr. Hawkins states:

This Court has not previously adopted an approach to analyzing whether a domestic relations order constitutes a QDRO. This case involves the interpretation of a document drafted in pursuance of Federal tax law which allows private parties to allocate certain tax consequences between themselves. In such circumstances, the law has developed a significant respect for the language incorporated into an agreement between negotiating parties.

For example, in *Commissioner of Internal Revenue v. Lester*, 81 S.Ct. 1343, 366 U.S. 299 (1961), the Supreme Court considered the language of a domestic relations order relating to the payment of money as child support and its effect on the tax liability of former spouses. The order had provided for a 1/6 reduction in payments to the former wife in the event of marriage, death, emancipation, etc. of any of the three children. The Code allows an exclusion from income for money "fixed" by a domestic relations order as allocable to child support. (Code Section 71(c).)

While the parties in *Lester* obviously intended a portion of the payments to be for child support, the Supreme Court relied upon their failure to specify the amount for its decision that the full amount of the payments was income to the wife.

We agree with Dr. Hawkins' citation of the *Lester* case, but we do not agree that its analysis favors his position. In *Commissioner v. Lester*, 366 U.S. 299, 305–306 (1961), the Supreme Court concluded:

It was just such uncertainty in tax consequences that the Congress intended to and, we believe, did eliminate when it said that the child-support payments should be "specifically designated" or, as the section finally directed, "fixed." It does not say that "a sufficiently clear purpose" on the part of the parties would satisfy. It says that the written instrument must "fix" that amount or "portion of the payment" which is to go to the support of the children.

\* \* \* \* \* \* \*

All of these considerations lead to the conclusion that if there is to be certainty in the tax consequences of such agreements the allocations to child support made therein must be "specifically designated" and not left to determination by inference or conjecture. We believe that the Congress has so demanded in sec. 22(k). After all, the parties may for tax purposes act as their best interests dictate, provided, as that section requires, their action be clear and specific. Certainly the Congress has required no more and expects no less.

By analogy, we conclude that a QDRO should be "clear and specific" and not "left to determination by inference or conjecture." To allow otherwise would be to spawn again "a relentless stream of litigation" comparable to that described in *Beard v. Commissioner*, 77 T.C. 1275, 1284 (1981), and

sought to be reduced by enactment of section 71. See H. Rept. 98–432 (Part 2), at 1495 (1984).

The plain language of section 414(p) states that a domestic relations order must create or recognize an alternate payee's right to, or assign to an alternate payee the right to, plan benefits payable with respect to a plan participant in order to constitute a QDRO. See, e.g., *Caminetti v. United States*, 242 U.S. 470, 485 (1917) (stating that a court must accord first priority in statutory interpretation to the plain meaning of the provision in question).

We do not believe that identifying the pension plan as the source of the $1 million cash payable to Mrs. Hawkins necessarily created, recognized, or assigned rights to her, as an alternate payee, in the benefits payable under the pension plan. The settlement agreement did not refer to her as an alternate payee, and any indication therein that she was to be taxable on the distribution, as an alternate payee would be, was ambiguous at best. Thus, we are not persuaded that the marital settlement agreement satisfies section 414(p)(1)(A) or that Mrs. Hawkins is an alternate payee under section 414(p)(8).

In addition, the marital settlement agreement does not meet the requirements of section 414(p)(2). Section 414(p)(2) states that a domestic relations order must "clearly specify certain facts" in order to constitute a QDRO. The facts that must be "clearly [specified]" in the order include: The name and address of the plan participant and alternate payee; the amount or percentage of the participant's benefits to be paid by the plan to the alternate payee; the number of payments or period to which such order applies; and the plan to which such order applies. Sec. 414(p)(2)(A), (B), (C), and (D).

The legislative history of REA indicates that the QDRO provision was intended to clarify ERISA antialienation and preemption rules "by creating a limited exception that permits benefits under a pension, etc., plan to be divided under certain circumstances." S. Rept. 98–575, at 19 (1984), 1984–2 C.B. at 456. The Senate report also states that "In order to provide rational rules for plan administrators, the committee believes it is necessary to establish guidelines for determining whether the exception to the spendthrift rules applies." *Id.* Thus, the section 414(p)(2) requirement that certain facts be specified clearly serves the purpose of aiding

plan administrators in determining whether certain domestic relations orders are covered by the limited exception to the antialienation and preemption rules. In relation to this end, the Senate report also states:

The committee intends that an order will not be treated as failing to be a qualified order merely because the order does not specify the current mailing address of the participant and alternate payee if the plan administrator has reason to know that address independently of the order. For example, if the plan administrator is aware that the alternate payee is also a participant under the plan and the plan records include a current address for each participant, the plan administrator may not treat the order as failing to qualify. [S. Rept. 98–575, at 20 (1984), 1984–2 C.B. at 457.]

Based on this language, Dr. Hawkins contends that we should evaluate the section 414(p) requirements in relation to the subjective knowledge of the plan administrator on a case-by-case basis. Dr. Hawkins maintains that this conclusion is the logical extension of the language in the legislative history that states that the requirement that addresses be set forth in a QDRO would serve no purpose in cases where the administrator has independent knowledge of the address.

In this case, Dr. Hawkins is both the plan participant, claiming that a QDRO was executed, and the plan administrator, who, under section 414(p)(6), has the responsibility to determine whether the marital settlement agreement is a QDRO. The issue presented, then, is whether the domestic relations order in these cases need not clearly specify the required facts because, unlike the situation where the plan administrator is an independent party, the plan administrator here already knows the facts that are required to be specified clearly under section 414(p)(2). We are not persuaded that such an exception to the specification rule is appropriate.

Carrying Dr. Hawkins' subjective knowledge standard to its logical extreme would suggest that a domestic relations order that makes *no* mention of the facts required to be specified clearly under section 414(p)(2) is nonetheless a QDRO because the plan administrator independently knew such facts. This result would directly contradict the plain language in section 414(p)(2) requiring a QDRO to "clearly specify certain facts". It would also create uncertainty and spawn litigation. Thus, we decline to use the Senate report

to substitute a general standard of subjective knowledge on a case-by-case basis when the statute, as enacted, expressly requires certain facts to be specified clearly in the order.

Dr. Hawkins also contends that the language in the Senate report regarding a relaxation of the address specification requirement indicates the legislature's intent that substantial compliance with the terms of section 414(p) is adequate. We need not address this contention because the agreement is inadequate in a fundamental or "substantial" sense. We focus our inquiry on whether the marital settlement agreement "clearly specifies" the facts required by section 414(p)(2).

Mrs. Hawkins concedes that the address information is unnecessary in light of the statements in the Senate report. Thus, we assume that the name and address specification requirement of section 414(p)(2)(A) is satisfied.

Dr. Hawkins contends that the specification of the amount of benefits to be paid requirement of section 414(p)(2)(B) is satisfied because the marital settlement agreement states that the wife is to receive $1 million from the pension plan. Dr. Hawkins further contends that the marital settlement agreement clearly specified the number of payments, as required by section 414(p)(2)(C), because the agreement stated that payment was to be made in cash and because there was no provision for deferred payments.

Dr. Hawkins now argues that the only reasonable conclusion from this provision is that Mrs. Hawkins was to receive the cash immediately in a lump-sum distribution. In fact, however, the total was paid in installments. We are not persuaded that the language in the marital settlement agreement is free from ambiguity and stated explicitly enough to be "clearly [specified]".

We have scrutinized the language in the marital settlement agreement and determined that it does not satisfy the requirements of section 414(p). We note that the proposed QDRO that Dr. Hawkins submitted to the New Mexico district court with his motion identified the addresses of petitioners, designated Mrs. Hawkins as the "alternate payee", and expressly stated that it "creates and recognizes the alternate payee's right to One Million Dollars of Arthur C. Hawkins' interest in the Pension Plan." Although the proposed lan-

guage would have served his purpose, it contrasts sharply to the language used in the executed agreement.

*Conclusion*

Because the marital settlement agreement is not a valid QDRO, section 402(a)(9) is inapplicable. Because Dr. Hawkins is the plan participant who, under the plan, is entitled to the distribution, we conclude that the plan distributions made in 1987 are includable in his 1987 gross income. Accordingly, respondent is entitled to summary judgment with respect to the issue of whether Dr. Hawkins is liable under section 402(a)(1) for the income tax on the amount distributed from the pension plan.

Because we hold that the marital settlement agreement does not satisfy the requirements of section 414(p), we need not consider the evidence proffered by Mrs. Hawkins regarding her contention that the agreement itself was not intended to constitute a QDRO.

To reflect the foregoing,

> *An appropriate order and decision will be entered for respondent in docket No. 30310–91.*
>
> *An appropriate order and decision will be entered for petitioner in docket No. 28446–92.*