BARBARA BROTMAN, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 29294–91.          Filed August 24, 1995.

*Mervin M. Wilf,* for petitioner.
*Keith L. Gorman* and *Kenneth J. Rubin,* for respondent.

OPINION

TANNENWALD, *Judge:* Respondent determined a deficiency in petitioner's 1988 Federal income tax of $11,752 and an addition to tax of $588 under section 6653(a)(1).[1] This case is before us on respondent's motion for partial summary judgment under Rule 121 that collateral estoppel precludes petitioner's claim that a domestic relations order entered January 7, 1988, by the Court of Common Pleas for Montgomery County, Pennsylvania, is not a "qualified domestic relations order" within the meaning of section 414(p).

The disposition of a motion for summary judgment under Rule 121(b) is controlled by the following principles: (a) The moving party must show the absence of dispute as to any material fact and that a decision may be rendered as a matter of law; (b) the factual materials and the inferences to be drawn from them must be viewed in the light most favorable to the party opposing the motion; (c) the party opposing the motion cannot rest upon mere allegations or denials, but must set forth specific facts showing there is a genuine issue for trial. *O'Neal v. Commissioner,* 102 T.C. 666, 674 (1994). Summary judgment is available to establish the collateral estoppel defense, as respondent seeks to do herein. *Scooper Dooper, Inc. v. Kraftco Corp.,* 494 F.2d 840, 847 (3d Cir. 1974).

The following facts are from the admissions of petitioner, the pleadings, and an affidavit produced by respondent with accompanying documents, none of which have been challenged by petitioner. Solely for the purposes of disposing of respondent's motion, we set forth a summary of the facts relevant to our discussion. Fed. R. Civ. P. 52(a); *Sundstrand Corp. v. Commissioner,* 98 T.C. 518, 520 (1992), affd. 17 F.3d 965 (7th Cir. 1994).

Petitioner resided in Narberth, Pennsylvania, at the time of the filing of the petition.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

From June 9, 1957, through February 16, 1978, petitioner was married to Matthew T. Molitch (Molitch or ex-husband). At all relevant times, Molitch was employed by Clark Transfer, Inc., and participated in the Clark Transfer Profit Sharing Plan (the plan).

On February 16, 1978, the Superior Court of New Jersey entered a divorce decree, ending the marriage between petitioner and Molitch, along with a property settlement agreement. Among other provisions, the agreement provided that 516⅔ shares of Clark Transfer, Inc. common stock, jointly owned by petitioner and her ex-husband, were to be split, with petitioner receiving 173⅓ shares. Further, Molitch was obligated to purchase 7 shares from petitioner each year, commencing in 1984, at a purchase price of $1,500 per share, and had the option of purchasing up to an additional 7 shares per year on the same terms, until all of petitioner's stock was purchased.

On March 20, 1987, petitioner filed a petition in the Court of Common Pleas for Montgomery County, Pennsylvania, registering the New Jersey divorce decree and property settlement, for the purpose of giving jurisdiction to the court to order additional payments of alimony from petitioner's ex-husband. On June 2, 1987, before Judge Horace Davenport, an agreement to amend the property settlement agreement between petitioner and Molitch was read into the record in that proceeding. Counsel for petitioner's ex-husband stated:

> If your Honor pleases, the parties have agreed that Mr. Molitch will, through a qualified Domestic Relations Order which shall be submitted to Your Honor at a later time for execution and signature and approval, withdraw or have withdrawn from an existing pension that he has with the Clark Group the sum of $350,000.00. The purpose of doing it under a qualified Domestic Relations Order, Your Honor, is to avoid any tax consequences to Mr. Molitch for removing any monies from his pension. This sum will be paid over to Mrs. Brotman when it is received.

The agreement also provided that petitioner would transfer to Molitch all her then stock holdings in Clark Transfer, Inc., consisting of 140 shares.

In response to a query of the court, petitioner's counsel stated:

> I merely add that this agreement will be reduced to writing and that the parties will acknowledge and sign the agreement when it is drafted.

Further, both petitioner and her ex-husband were sworn in by the court and asked to affirm their understanding and approval of the agreement as read into the record. Petitioner also answered in the affirmative when asked if she understood that she could not seek modification of certain waivers to amend or modify the agreement. Furthermore, petitioner testified that she was under the care of a treating psychiatrist, but that the psychiatrist did not indicate he doubted petitioner had the capacity to understand or accept the agreements. Petitioner also answered in the affirmative to a question of whether she felt she had that capacity.

Following the proceedings, counsel for petitioner wrote a letter to Judge Davenport requesting that the court not enter any order, with respect to the proceedings, until counsel could file a petition challenging the entry of a qualified domestic relations order in the proceedings. In particular, that letter asserted that there were serious questions remaining as to the tax consequences to petitioner or Molitch which would result from the entry of a qualified domestic relations order.

Finding no reason to delay the entry of the order, on January 7, 1988, the court entered a purported qualified domestic relations order (QDRO), which provided petitioner was to receive $350,000 out of Molitch's account in the plan.[2] The order stated: "It is intended that this Order shall qualify as a Qualified Domestic Relations Order under the Retirement Equity Act of 1984, P.L. 98.397."

In 1988, petitioner received, and cashed, a check from the plan in the amount of $350,000. Of the total, petitioner placed $250,563 into an individual retirement account (IRA). Later in 1988, petitioner withdrew $30,000 from the IRA.

On December 30, 1988, petitioner filed a complaint in the U.S. District Court for the Eastern District of Pennsylvania, naming Molitch and David Gillis, the plan administrator and trustee, as defendants. The issue raised by petitioner's complaint involved whether the purported QDRO issued by the Court of Common Pleas met the statutory requirements of a

---

[2] Petitioner admits to the above sentence, with the qualification that at the time she suffered from a psychological disorder known as dissociation. Because of the disorder, petitioner avers she was incapable of placing the property settlement on the record, or agreeing to entry of the qualified domestic relations order. Petitioner, however, was represented by counsel, who was cognizant of petitioner's problem and who questioned petitioner in open court about it, as did Molitch's counsel.

QDRO under section 206(d)(3) of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93–406, 88 Stat. 829, 29 U.S.C. sec. 1056(d)(3) (1988). As relief, petitioner sought "to reverse the illegal payments so she will continue tax benefits to which she is entitled under a 1978 Property Settlement Agreement between plaintiff and her former husband, one of the defendants, but to which she might not be entitled unless such reversal is effected."

In support of these requests, petitioner alleged as follows:

20. By having the payments described in paragraph 11 (for plaintiff's medical expenses) and in paragraph 15 (for the purchase price of Clark Common Stock owed to plaintiff) made from his account in the Clark Profit Sharing Plan, Molitch participated in a scheme which was designed to avoid personal income tax on the $350,000 paid out of his account in the Clark Profit Sharing Plan under the Purported QDRO.

21. The $350,000 paid out of the Clark Profit Sharing Plan would have been taxable to Molitch as ordinary income under §402(a) of the Internal Revenue Code of 1986 (the "Code") when distributed to him under the provisions of §401(a)(9) of the Code. If successful, the effect of the use of his account in the Clark Profit Sharing Trust to pay for his personal nondeductible obligations was the equivalent of Molitch's getting a deduction for such nondeductible payments of $350,000.

To implement this objective, petitioner asked the District Court to determine, among other things: (a) That the purported QDRO does not qualify as a QDRO as defined in ERISA; and (b) that, because the purported QDRO does not qualify as a QDRO, it is null and void and unenforceable.

Both defendants filed motions to dismiss, which the court treated as motions for summary judgment. In an opinion dated August 1, 1989, the District Court granted summary judgment in favor of the defendants. The court concluded that the order entered by Judge Davenport met ERISA's definition of a QDRO.

On November 21, 1991, the District Court entertained petitioner's motion for reconsideration. Such motion was denied in an order dated December 17, 1991. No appeal was taken.

In her 1988 Federal income tax return, petitioner reported a capital gain from the transfer of her 140 shares of Clark Transfer, Inc., based upon her having received $210,000 or $1,500 per share. In the notice of deficiency, respondent determined that petitioner had failed to report as income the

$30,000 withdrawal from the IRA, and another $644 of interest income. In an amendment to answer, respondent alleged that the amount which was not deposited into the IRA, $99,438, was taxable as ordinary income to petitioner, and that petitioner was estopped from denying that the amount received from the plan was received pursuant to a QDRO.

Petitioner asserts that she is not collaterally estopped by the decision of the U.S. District Court from contending that the order of the Montgomery County Court of Common Pleas does not constitute a QDRO for Federal income tax purposes. Petitioner's position rests upon assertions relating to the technical requirements of a QDRO and the U.S. District Court's decision in respect thereto, and assertions that the U.S. District Court's decision did not extend to a determination of the QDRO status of such order for Federal income tax purposes and that the order should not be accorded such status because the plan was not entitled to exempt status. Respondent counters that, by virtue of the decision of the U.S. District Court, petitioner is collaterally estopped from contending that the order of the Montgomery County court was not a QDRO. Both petitioner and respondent appear to have posited their arguments on the assumption that, if such order was a QDRO, petitioner would be taxable on the excess of the $350,000 distribution she received over the rollover into the IRA (respondent does not seek to tax the amount of the rollover[3] other than to the extent of the $30,000 withdrawn therefrom), but that, if such order were not a QDRO, petitioner's ex-husband and not petitioner would be taxable in respect of the distribution.[4] As will subsequently become apparent, such all-or-nothing treatment will not necessarily flow from our decision herein. Indeed, the road to decision herein is a rocky one through a briarpatch of thorny questions. See *Union Carbide Corp. v. Commissioner*, 75 T.C. 220, 251 (1980), affd. per curiam 671 F.2d 67 (2d Cir. 1982), in which we referred to "the world of light and shadows in which the doctrines of res judicata and collateral estoppel have long existed." In order to provide a map of the terrain

[3] See *Rodoni v. Commissioner*, 105 T.C. 29 (1995).

[4] As far as the record herein discloses, respondent has not sought to protect her position as a potential stakeholder by determining a deficiency against Molitch.

through which this road can be delineated, we shall first set forth the governing statutory provisions.

The injection of the provision of section 414(p), establishing the requirements of a QDRO, came as a result of problems created by the antialienation provisions embodied in the labor and tax provisions of ERISA. In 1984, these provisions were modified to except from their operation "qualified domestic relations orders", the requirements of which were set forth in detail "For purposes of * * * section 401(a)(13)". See sec. 414(p), *infra* note 8. The exception was accomplished by amending the antialienation requirement of a qualified plan and specifying that the antiassignment rule would not apply to a provision in the plan permitting assignment by means of a QDRO. See sec. 401(a)(13). At the same time, section 402(a), entitled "Taxability of Beneficiary of Exempt Trust", was amended to provide: "For purposes of subsection (a)(1) and section 72", a spouse who was designated as an alternative payee under a QDRO would be considered a "distributee" in determining the taxability of distributions from the tax-exempt plan under section 402(a)(1). See sec. 402(a)(9) (now embodied in sec. 402(e) setting forth "Other Rules Applicable to Exempt Trusts"). The provisions of section 402(b)(2), relating to the "Taxability of Beneficiaries of Nonexempt Trust" categorized as "distributees", were not changed.[5] Thus, a clear statutory distinction was created between a domestic relations order providing for an assignment of benefits under a qualified plan and an order providing for an assignment of benefits under a nonqualified plan. This distinction is accomplished not by establishing differences in the descriptive requirements and thus the existence of a qualified domestic relations order but by providing for special tax treatment of a QDRO only in respect of distributions from a qualified plan.

Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States,* 440 U.S. 147, 153 (1979); *Hawkins v. Commissioner,* 102 T.C. 61, 68

---

[5] For a detailed description of the evolution of the QDRO provisions, including the legislative history, see *Darby v. Commissioner,* 97 T.C. 51 (1991).

(1994), on appeal (10th Cir., June 8 and 9, 1994); see 1 Restatement, Judgments 2d, sec. 27 (1982). Collateral estoppel has the "dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 (1979); *Meier v. Commissioner,* 91 T.C. 273, 282 (1988). Collateral estoppel may apply to matters of fact, matters of law, or to mixed matters of law and fact. *Meier v. Commissioner, supra* at 283. Respondent may assert collateral estoppel although not a party to the District Court proceeding. *Parklane Hosiery Co. v. Shore, supra.*

Respondent argues that collateral estoppel should apply because each of the conditions set forth in *Peck v. Commissioner,* 90 T.C. 162, 166–167 (1988), affd. 904 F.2d 525 (9th Cir. 1990), is satisfied. Those conditions are:

(1) The issue in the second suit must be identical in all respects with the one decided in the first suit.

(2) There must be a final judgment rendered by a court of competent jurisdiction.

(3) Collateral estoppel may be invoked against parties and their privies · to the prior judgment.

(4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

(5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation.

[Citations omitted.]

Petitioner argues that the first and fifth conditions have not been met. Petitioner also contends she did not have a full and fair opportunity to litigate the QDRO issue, and that there are special circumstances that warrant an exception to the normal rules of preclusion. See *Montana v. United States, supra* at 155.[6]

### 1. *Identity of Issues*

It is a well-established rule that collateral estoppel focuses on the identity of issues, not the identity of legal proceedings.

---

[6] In *Montana v. United States,* 440 U.S. 147 (1979), the Supreme Court set forth three requirements for the application of collateral estoppel. This Court further refined the necessary conditions in a factual context in *Peck v. Commissioner,* 90 T.C. 162 (1988), affd. 904 F.2d 525 (9th Cir. 1990). The first two *Montana* conditions are duplicated in *Peck.* See *Smith v. Commissioner,* T.C. Memo. 1991–419. The special circumstances exception is the third requirement set forth in *Montana.*

*Bertoli v. Commissioner,* 103 T.C. 501, 508 (1994); *O'Leary v. Liberty Mut. Ins. Co.,* 923 F.2d 1062, 1069 (3d Cir. 1991) (applying the law of Pennsylvania that adopts the requirements of Restatement, Judgments 2d (1982)).

The issue decided by the District Court was whether the order entered by the Court of Common Pleas for Montgomery County, Pennsylvania, was a valid QDRO under ERISA section 206(d)(3), 29 U.S.C. sec. 1056(d)(3) (1988). Respondent argues that because the definition of a QDRO in ERISA section 206(d)(3), 29 U.S.C. sec. 1056(d)(3) (1988),[7] is virtually identical to the definition under section 414(p),[8] there is an identity of issues. A review of the corresponding statutes bears out respondent's contention.

The similarity between section 414(p) and ERISA section 206(d)(3), 29 U.S.C. sec. 1056(d)(3), is more than coincidental. The statutes were enacted simultaneously in the Retirement Equity Act of 1984, Pub. L. 98–397, 98 Stat. 1433–1436, 1445–1449.[9] Also, Congress required that in promulgating regulations under these provisions, the Department of Labor should consult with the Department of the Treasury,

---

[7] ERISA sec. 206(d)(3)(B), 29 U.S.C. sec. 1056(d)(3)(B) (1988), provides:

(B) For purposes of this paragraph—

(i) the term "qualified domestic relations order" means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

[8] Sec. 414(p)(1) provides:

(1) IN GENERAL.—

(A) QUALIFIED DOMESTIC RELATIONS ORDER.—The term "qualified domestic relations order" means a domestic relations order—

(i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(ii) with respect to which the requirements of paragraphs (2) and (3) are met.

(B) DOMESTIC RELATIONS ORDER.—The term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—

(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(ii) is made pursuant to a State domestic relations law (including a community property law).

[9] "The reason that many ERISA sections have such counterparts in the IRC is that, to encourage employers to establish pension plans, Congress provides favorable tax treatment for plans which comply with ERISA's requirements." *Gillis v. Hoechst Celanese Corp.,* 4 F.3d 1137, 1144 n.6 (3d Cir. 1993).

thus intending that the statutes be interpreted in a uniform manner. Sec. 414(p)(12); ERISA sec. 206(d)(3)(N), 29 U.S.C. sec. 1056(d)(3)(N); see H. Conf. Rept. 93–1280 (1974), 1974–3 C.B. 415, 517–521; see also S. Rept. 98–575 (1984), 1984–2 C.B. 447, 458.

Indeed, because of the "mirror-like" nature of certain corresponding IRC and ERISA sections, the Court of Appeals for the Third Circuit, to which an appeal in this case will lie, has stated that, when interpreting a section of ERISA, it is appropriate to look for guidance to sources which have interpreted its "mirror-like counterpart" in the Internal Revenue Code. *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1144 (3d Cir. 1993); cf. *Commissioner v. Keystone Consol. Indus., Inc.* 508 U.S. ___, 113 S. Ct. 2006, 2011 (1993) ("It is a 'normal rule of statutory construction' * * * that 'identical words used in different parts of the same act are intended to have the same meaning.'").

In sum, for purposes of determining whether the District Court decided there was a QDRO, section 414(p) and ERISA section 206(d)(3), 29 U.S.C. sec. 1056(d)(3), are interchangeable, and it is immaterial which statute was actually cited by the District Court. Nor is there any doubt that petitioner had the opportunity to litigate and actually litigated the issue of whether there was a QDRO in the U.S. District Court. See *Parklane Hosiery Co. v. Shore,* 439 U.S. at 331 n.15.

### 2. *Change in Controlling Facts or Legal Rules*

#### a. *Facts*

Petitioner's argument that there has been a change in controlling facts is supported only by her repeated assertion that the profit sharing plan was not a qualified plan at the time of the distribution. Even were this correct, it does not represent a change in controlling facts insofar as the descriptive requirements and consequently the *existence* of a QDRO are concerned.

#### b. *Legal Rules*

Nor has there been a change in controlling law. Petitioner argues there has been a change in law due to a document published by the Department of Labor, wherein the agency requested information from the public to assist the agency in

assessing the need for a regulation supplementing the statutory QDRO provisions of ERISA and the Internal Revenue Code.

Petitioner argues that the Department of Labor, through the document, "has stated unambiguously that a requirement of law is that a plan *'must* establish, and a plan administrator *must* observe,' written procedures relating to QDRO's."

Petitioner's reliance is misplaced. The agency was merely summarizing ERISA section 206(d)(3)(G) and (H) for the purpose of soliciting comments on a contemplated regulation. The agency was not attempting to change, or even to fill in, the statutory provisions.

### 3. *Special Circumstances*

The remaining two arguments of petitioner are that she did not have a full and fair opportunity to litigate the QDRO issue, and that special circumstances warrant an exception to the normal rules of preclusion. Under the three-part test enumerated in *Montana v. United States,* 440 U.S. at 155, 162–164, the former inquiry is part of the latter, broader inquiry. See *Parklane Hosiery Co. v. Shore,* 439 U.S. at 331 n.15. Thus, we discuss them together.

With respect to the contours of the special circumstances exception, the Supreme Court stated: "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States,* 440 U.S. at 164 n.11. The Court of Appeals for the Third Circuit has remarked: "A party has been denied a full and fair opportunity to litigate only when * * * [the first court's] procedures fall below the minimum requirements of due process as defined by federal law." *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1074 (3d Cir. 1990). In short, it is not enough for petitioner to express a "mere belief that * * * [the first decision] was wrongly decided to avoid the application of the collateral estoppel doctrine." *Disabled American Veterans v. Commissioner,* 942 F.2d 309, 316 (6th Cir. 1991), revg. on other grounds 94 T.C. 60 (1990); *Peck v. Commissioner,* 904 F.2d 525, 530 (9th Cir. 1990), affg. 90 T.C. 162 (1988).[10]

---

[10] See *Disabled American Veterans v. Commissioner,* T.C. Memo. 1994–505.

Petitioner asserts "that the first court [the U.S. District Court] completely missed the point," citing *University of Ill. Found. v. Blonder-Tongue Lab., Inc.,* 334 F. Supp. 47 (N.D. Ill. 1971), affd. 465 F.2d 380 (7th Cir. 1972), and points to the alleged failure of Molitch to meet the "earliest retirement age" requirement, the absence of the consent of Molitch's then spouse to the distribution to petitioner, and the lack of proper notice to, and opportunity for a hearing of, petitioner herein. These arguments were fully considered by the District Court, and the possibility that rejection of these arguments may have been wrong (which, in any event, we do not think is the case) is not sufficient to constitute a "special circumstance" justifying our reconsideration of the arguments. To correct alleged errors in the District Court's findings, petitioner should have appealed the decision of the District Court.

In support of her argument that she did not have a full and fair opportunity to litigate, petitioner asserts that, due to the disposition of the District Court by way of summary judgment, she was not able to engage in discovery in the first proceeding, particularly with respect to whether the plan was a qualified plan under sections 401(a) and 501(a). In the context of resolving the issue of the existence of a QDRO, petitioner's argument is misplaced. As we have already pointed out, the question whether a domestic relations order meets the descriptive requirements of a QDRO does not depend upon the qualification of the plan to which it relates. See *supra* p. 147. Nothing in the record before us suggests that there is any dispute as to the facts relating to the existence of a QDRO herein because the descriptive requirements of a qualified domestic relations order were satisfied, or that had discovery been made available to petitioner in the District Court proceeding, any dispute as to those facts would have been developed.

In sum, we find no special circumstances warranting an exception to the normal rule of preclusion by way of collateral estoppel.

We conclude that petitioner is collaterally estopped by the decision of the U.S. District Court from asserting herein that the order of the Montgomery County court is not a QDRO.

Such conclusion does not, however, dispose of the question whether collateral estoppel precludes petitioner from litigat-

ing the issue of the tax exemption of the plan in this proceeding. Initially, we note that since that issue directly affects the adjudication of the deficiency asserted by respondent against petitioner, petitioner clearly has standing to raise the issue. Cf. *Anthes v. Commissioner,* 81 T.C. 1 (1983), affd. without published opinion 740 F.2d 953 (1st Cir. 1984).[11] Compare section 7476, dealing with who is entitled to seek a declaratory judgment in respect of the tax exemption of retirement plans.

Unquestionably, the issue of the tax-exempt status of the plan for Federal income tax purposes was not directly litigated in the District Court. Indeed, there is no indication in the record herein that the issue was even raised by petitioner in the proceeding before the District Court relating to the existence of a QDRO under ERISA, nor was it an essential ingredient of the District Court's decision. Cf. *O'Leary v. Liberty Mut. Ins. Co.,* 923 F.2d 1062 (3d Cir. 1991). Nor would there appear to have been any basis for the assertion of such a claim in a proceeding involving only the question of the existence of such a QDRO. Moreover, at no time during such proceeding had respondent determined any deficiency against petitioner. Thus, disposition of the issue by the District Court (even if it had been raised by petitioner) would, in effect, have been a declaratory judgment as to petitioner's and/or Molitch's tax liability in a situation which is not encompassed by section 7476 (which confers jurisdiction to issue declaratory judgments in respect of retirement plans only on this Court) and is specifically excluded from the general declaratory judgment jurisdiction of the District Courts. See 28 U.S.C. sec. 2201 (Supp. 1993), which, except under section 7428, prohibits the issuance of declaratory judgments by a District Court in respect of Federal taxes. Under these circumstances, the lack of jurisdiction of the District Court to resolve the tax-exempt-status issue in any event would preclude the application of the doctrine of collateral estoppel. 1 Restatement, Judgments 2d, sec. 28(3), and comment d (1982); see *O'Leary v. Liberty Mut. Ins. Co.,* 923 F.2d at 1066 n.5. An analogous situation arose in *Martin v. Garman Constr. Co.,* 945 F.2d 1000 (7th Cir. 1991). In that case, the National Labor Relations Board determined that a labor

---

[11] Cf. also *Day v. Commissioner,* T.C. Memo. 1985–251.

agreement was valid and enforceable but that a remedy for an unfair labor practice under the National Labor Relations Act was not available. Thereafter, a proceeding on the violation of ERISA was reinstated by the U.S. District Court. The Court of Appeals for the Seventh Circuit affirmed the use of collateral estoppel by the District Court as to the issue of the existence of a valid and enforceable agreement, but not as to the issue of the availability of a remedy under ERISA. The Court of Appeals rested its disposition on two grounds: (1) That the unfair labor practice remedy under the National Labor Relations Act and the remedy for a violation of ERISA involved two distinct remedies, and (2) the National Labor Relations Board did not have jurisdiction to resolve the dispute as to a violation of ERISA.

Moreover, aside from the question of the District Court's jurisdiction, our analysis herein establishes that the issues of the existence of a QDRO for Federal income tax purposes, i.e., a domestic relations order that meets the descriptive requirements of section 414(p), and the tax consequences flowing therefrom in relation to the tax-exempt status of the plan to which the order relates, are separate issues. This being the case, a determination as to the first issue does not preclude the consideration of the second issue. The Court of Appeals for the Eighth Circuit faced a similar situation in *Richardson v. Phillips Petroleum Co.*, 791 F.2d 641 (8th Cir. 1986). In that case, a refusal by the Arkansas Oil & Gas Commission to grant injunctive relief on the basis of failure to prove increasing and irreparable damage to the appellant's oil well by the appellee did not operate by way of collateral estoppel to preclude an action for damages against the appellee on the ground that two distinct elements were involved, even though the foundation of each element was the same; i.e., improper recovery operations of the appellee's oil wells. Cf. *Martin v. Garman Constr. Co., supra* (unfair labor practice remedy under National Labor Relations Act and remedy for ERISA violation were two distinct remedies). The Court of Appeals posited its position on the fact that different evidence was required in a suit for injunctive relief as contrasted with a suit for damages. It also noted that the

commission was without jurisdiction to award damages. See *Richardson v. Phillips Petroleum Co.,* 791 F.2d at 645.[12]

We find further support for our conclusion that there are separate issues herein, so that collateral estoppel does not apply, in our decision in *Vallone v. Commissioner,* 88 T.C. 794, 803–805 (1987), in which we held that a decision by a U.S. District Court denying enforcement of an audit summons because of improper action by respondent's agents did not preclude respondent from utilizing such evidence in the trial of the substantive tax issues.[13] See also *Bradley v. Pittsburgh Bd. of Educ.,* 913 F.2d 1064, 1079 (3d Cir. 1990), wherein the Court of Appeals for the Third Circuit concluded that disposition of a claim based on dismissal from employment on the ground of racial discrimination under 42 U.S.C. sec. 2000e to 2000e–17 (1982) could not be a basis for invoking collateral estoppel in a suit based on the same claim under 42 U.S.C. sec. 1983, which was designed to provide a vehicle for vindicating civil rights secured by the U.S. Constitution or Federal law.

We hold that collateral estoppel does not operate to preclude petitioner from litigating the issue of the tax-exempt status of the plan. In this connection, we note that although respondent, in her original memorandum in support of her motion, urged collateral estoppel as to the tax-exempt status of the plan in the context of whether the order of the Montgomery County Court was a QDRO, she states in her reply brief:

> Most importantly, respondent does not contend that petitioner is precluded by collateral estoppel from arguing the Plan was not qualified. Respondent contends estoppel applies to preclude petitioner from denying the DRO was a QDRO. The qualification of the Plan is not an issue presently before the Court. [Fn. ref. omitted.]

Finally, we turn to the question of whether the qualification of the plan is at issue before us. The issue was not adverted to in the petition that was filed on November 12, 1992, nor in the reply to respondent's amendment to answer filed on May 12, 1994. The first indication that such issue

---

[12] Cf. *Hawkins v. Commissioner,* 102 T.C. 61, 65 (1994), where the earlier court rested its action in part on lack of jurisdiction.

[13] See also *Barnette v. Commissioner,* T.C. Memo. 1990–535, where we allowed the taxpayer to advance a constitutional argument against the imposition of the additional tax for civil fraud even though he had been criminally convicted for fraud.

was involved appears to have been given by petitioner at a hearing before the Court on October 24, 1994. Further indications of some of the elements involved in the issue were set forth in petitioner's memorandum in response to respondent's memorandum in support of her motion for partial summary judgment.

Respondent urges that, since this case has been pending since 1991, petitioner should not be permitted now to raise the issue in light of the absence of sufficient details of the facts upon which petitioner relies. In this connection, we note that several continuances herein were consented to by respondent based in part upon the ground that respondent needed more time to decide whether to assert a deficiency against Molitch. We further note that in July 1994 respondent consented to the taking of the deposition of the administrator of the plan in which the operation of the plan and its impact on the plan's tax-exempt status apparently were explored. Petitioner asserts in her memorandum that such deposition has revealed loan activities and payments of legal fees that could affect the plan's exempt status. Under these circumstances, and given the fact that the case will have to be calendared for trial on other unresolved issues, we are not disposed, *at this time,* to deny petitioner the right to pursue the issue of the qualification of the plan.

However, we think petitioner should, if she so desires, file an appropriate notice to amend her petition to raise the plan qualification issue setting forth sufficient facts to indicate that petitioner's position has merit and keeping in mind that the time frame for qualification is a narrow one, namely at or about the time of the distribution to petitioner. Respondent will be given an opportunity to respond, after which the Court will decide whether petitioner should be permitted to pursue the issue.

The Court also wishes the parties to understand that the consequences of the disposition of the qualification issue may involve the extent to which the doctrine of assignment of income comes into play, the proper treatment for tax purposes of the value of the stock transferred to Molitch by petitioner, and any other consideration which should be treated as having been furnished by her, and the impact, if any, of section 1041. See *Balding v. Commissioner,* 98 T.C. 368 (1992).

In order to implement the views expressed herein,

*An appropriate order will be issued.*