MARIO RODONI AND DONNA RODONI, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 28636–92.                    Filed July 24, 1995.

*John C. Suttle, James F. Fotenos,* and *Mark M. Tucker* (specially recognized), for petitioners.

*William D. Reese* and *Emily Kingston,* for respondent.

RUWE, *Judge:* Respondent determined a deficiency of $146,544 in petitioners' 1988 Federal income tax. After concessions, the issues for decision are: (1) Whether the lump-sum distribution from a qualified profit sharing plan to petitioner Mario Rodoni (Mr. Rodoni) and its subsequent transfer into the individual retirement accounts of petitioner Donna Rodoni (Mrs. Rodoni) qualify as a tax-free rollover

under section 402(a)(5);[1] or (2) whether such transfers qualify as a tax-free rollover under section 402(a)(6)(F).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and attached exhibits are incorporated herein by this reference. Petitioners resided in Santa Cruz, California, at the time they filed their petition.

Petitioners were married on April 7, 1962. On February 22, 1985, Mrs. Rodoni filed a petition for dissolution of petitioners' marriage in the Superior Court of California for the County of Santa Cruz.

Throughout petitioners' marriage, and until May 23, 1988, Mrs. Rodoni was not employed outside the home. From 1972 until the present, Mr. Rodoni has been a shareholder, director, and employee of Sunset Farms, Inc. (Sunset Farms), a California corporation engaged in row-crop farming.

Sunset Farms adopted a profit sharing plan and trust (profit sharing plan) in 1973, and it adopted a defined benefit pension plan and trust (defined benefit plan) in 1980. Mr. Rodoni was a participant in both of these plans, and both plans were qualified under section 401(a).

In March 1986, the board of directors of Sunset Farms resolved to terminate the profit sharing plan effective March 31, 1986. Upon termination of the profit sharing plan, each participant could elect to have his vested benefit payable in one of two ways: (1) A 100-percent lump-sum distribution, or (2) a transfer of 100 percent of the vested benefit to the defined benefit plan. Mr. Rodoni elected to have his vested benefit payable in a lump-sum distribution.

On February 5, 1988, Mr. Rodoni received a check in the amount of $307,204.46, representing a lump-sum distribution of the balance of his account in the profit sharing plan. This distribution included a community property component of approximately $205,000 and a separate property component of approximately $102,000. Mr. Rodoni hand delivered the check to Mrs. Rodoni on the same day he received it. Mrs. Rodoni, on that day, deposited the check into a joint certifi-

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

cate of deposit account at Commercial Pacific Savings & Loan Association, Santa Cruz, California (Commercial Pacific account).

On April 4, 1988, within 60 days of Mr. Rodoni's receipt of the lump-sum distribution, Mrs. Rodoni withdrew all the funds in the Commercial Pacific account, $310,669.39, represented by two checks—one for $200,000 and one for $110,669.39. On the same day, Mrs. Rodoni deposited $92,000 of the $110,669.39 check into an account at Eureka Federal Savings & Loan, Santa Cruz, California (Eureka Federal), receiving back from Eureka Federal a check for the difference of $18,669.39. Also on that day, Mrs. Rodoni deposited the $200,000 Commercial Pacific check and the $18,669.39 Eureka Federal check into an account at Dean Witter Reynolds, Inc., Santa Cruz, California (Dean Witter). Both of these accounts were designated as rollover individual retirement accounts, and both accounts were in the name of Mrs. Rodoni alone. Mrs. Rodoni subsequently consolidated the Eureka Federal account into the Dean Witter account.

On October 25, 1988, Mrs. Rodoni executed a written marital settlement agreement (marital agreement), and on December 22, 1988, Mr. Rodoni executed the marital agreement. The marital agreement was attached to and incorporated by reference in the judgment of dissolution of marriage of petitioners, which was entered by the Superior Court of California for the County of Santa Cruz on January 24, 1989, nunc pro tunc to December 31, 1988. The marital agreement provided that Mrs. Rodoni was to receive the community property interest in the profit sharing plan, which amount was to be transferred into an individual retirement account (IRA) in the name of Mrs. Rodoni.

OPINION

Generally, a distribution from a qualified employees' trust is taxable to the distributee in the year of distribution. Sec. 402(a)(1). Section 402(a)(5)(A) provides an exception to the general rule for certain "rollovers" by the employee. Similarly, section 402(a)(6)(F) provides an exception for certain rollovers by recipients of distributions pursuant to qualified domestic relations orders. Petitioners argue that the transfer of Mr. Rodoni's lump-sum distribution to Mrs. Rodoni's IRA

falls within one of these exceptions. Alternatively, petitioners argue that if the transfer does not strictly meet the conditions for tax-free treatment under either of these provisions, then the transfer substantially complied with these provisions so as to permit tax-free treatment. We will address each argument in turn.

*Tax-Free Rollover*

Section 402(a)(5) provides that where the balance to the credit of an employee in a qualified trust is paid to him, and the employee transfers any portion of the distribution to "an eligible retirement plan" within 60 days of receipt, then the amount so distributed shall not be includable in gross income. Sec. 402(a)(5)(A), (C). The parties do not dispute that the lump-sum distribution to Mr. Rodoni represented the balance to the credit of Mr. Rodoni in the profit sharing plan, nor do they dispute that the proceeds of the distribution were transferred to Mrs. Rodoni's IRA within 60 days of Mr. Rodoni's receipt of the distribution. The only question is whether the proceeds of the distribution were transferred to "an eligible retirement plan".

Petitioners contend that a plan need not be established by, or for the benefit of, the employee/distributee to constitute "an eligible retirement plan". Respondent, on the other hand, argues that because Mrs. Rodoni was not an employee or a distributee of the lump-sum distribution, her IRA does not constitute "an eligible retirement plan". Neither party cites any cases directly on point; the question of whether a spouse's IRA constitutes an eligible retirement plan for purposes of section 402(a)(5) appears to be an issue of first impression.

The term "eligible retirement plan" is defined to include "an individual retirement account described in section 408(a)". Sec. 402(a)(5)(E)(iv)(I). An individual retirement account is defined in section 408(a)[2] as "a trust created or organized in the United States for the exclusive benefit of an individual or his beneficiaries". Thus, reading section 402(a)(5) in conjunction with section 408(a), a tax-free rollover requires a distribution to an employee and a transfer *by*

---

[2] Sec. 408(a) imposes additional requirements that a trust instrument must meet in order to qualify as an individual retirement account; however, there is no dispute that these additional requirements were met with respect to Mrs. Rodoni's IRA.

*the employee* to a trust created for the exclusive benefit of *an individual* or his beneficiaries. Secs. 402(a)(5)(A), 408(a). The inclusion of an individual's beneficiaries as persons who could receive potential benefits from an IRA appears to recognize that, under some circumstances, certain IRA benefits may pass to others without jeopardizing the trust's qualification as an individual retirement account. However, as its name suggests, the essence of an IRA is that it is a retirement account created to provide retirement benefits to "an individual".[3]

In the context of sections 402(a)(5)(E)(iv)(I) and 408(a), *"an individual"* does not mean *"any* individual". Section 402(a)(1) provides the general rule that a distribution from a qualified employees' trust is taxable to the distributee in the year of distribution. Section 402(a)(5) provides a limited exception to the general rule for rollovers *by an employee* where certain requirements are met. Section 402(a)(5)(A) was enacted for the purpose of promoting portability of pension benefits where an employee changes jobs or the pension plan terminates. S. Rept. 93–383, at 71–72 (1973), 1974–3 C.B. (Supp.) 80, 150–151; H. Rept. 93–807, at 29–30 (1974), 1974–3 C.B. (Supp.) 236, 264–265; H. Conf. Rept. 93–1280, at 341–342 (1974), 1974–3 C.B. 415, 502–503. The specific requirements of section 402(a)(5)(A) are designed to ensure that the employee's benefits will be used for that employee's retirement savings. S. Rept. 93–383, *supra* at 132, 1974–3 C.B. (Supp.) at 211. Indeed, the legislative history states:

the bill permits an individual, subject to limitations, where he receives a final distribution from an employer under a qualified plan, to contribute this amount *to his own individual retirement account* without these transfers giving rise to any tax. [*Id.* at 72, 1974–3 C.B. (Supp.) at 151; emphasis added.]

To allow an employee to escape tax on distributions from a plan that he transfers for the exclusive benefit of someone other than himself is contrary to the purpose for which sec-

---

[3] The requirement in sec. 408(a) that an IRA be for "the exclusive benefit of an individual or his beneficiaries" mirrors the requirement that a qualified profit sharing plan under sec. 401(a) be for the "exclusive benefit of * * * employees or their beneficiaries". This language in sec. 401(a) has been interpreted to mean that the funds accumulated under a qualified plan are intended primarily for distribution to the employees; payments to beneficiaries are to be merely incidental. See sec. 1.401–1(b)(1)(ii), Income Tax Regs.; Rev. Rul. 72–241, 1972–1 C.B. 108; Rev. Rul. 56–656, 1956–2 C.B. 280.

tion 402(a)(5)(A) was enacted. We, therefore, conclude that under section 402(a)(5), a tax-free rollover to an IRA requires that the IRA be one that is established for the benefit of the "individual" employee who received the distribution from an employees' trust.[4]

Petitioners understand the problems inherent in allowing an employee/distributee to make a tax-free rollover into *any* individual's IRA. Thus, they contend that their interpretation of "an eligible retirement plan" should be limited to the facts of this case, namely, the transfer of a lump-sum distribution from a qualified plan to a retirement plan in the name of the employee's spouse, incident to a divorce. We reject this contention. The relevant statutes apply generally. There is nothing in section 402(a)(5) that permits a tax-free rollover of a distribution to an employee/distributee into an IRA of his or her spouse. We must therefore look to other statutory exceptions to the general rule of section 402(a)(1).

*Qualified Domestic Relations Order*

Section 402(a)(6)(F) provides an exception to the general rule for certain rollovers by recipients of distributions made pursuant to qualified domestic relations orders (QDRO). To qualify as a tax-free rollover under section 402(a)(6)(F), certain requirements must be met. First, the balance to the credit of the recipient must be distributed to the recipient within 1 taxable year. Second, the distribution must be by reason of a QDRO. Finally, the recipient must transfer, or roll over, the distributed property into an IRA or other qualified plan. Respondent argues that the series of transfers made by petitioners did not qualify as a tax-free rollover pursuant to section 402(a)(6)(F), because the lump-sum distribution was not made *by reason of* a *qualified* domestic relations order.

A QDRO is a domestic relations order which (1) creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, (2) clearly specifies certain facts, and (3) does

---

[4] Further exceptions to the general rule of sec. 402(a)(1) are specifically provided for in sec. 402. For example, sec. 402(a)(6)(F) and (7) permits tax-free rollovers by alternate payees (pursuant to qualified domestic relations orders) and by deceased employees' spouses, respectively. These specific exceptions in sec. 402(a)(6)(F) and (7) would arguably be unnecessary if sec. 402(a)(5) were intended to permit the rollover of plan distributions into any IRA, regardless of the identity of the individual for whose benefit the IRA was established.

not alter the amount or form of the benefits under the plan. Sec. 414(p)(1)(A), (2), and (3). A domestic relations order is defined as "any judgment, decree, or order (including approval of a property settlement agreement) which—(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse * * * and (ii) is made pursuant to a State domestic relations law (including a community property law)." Sec. 414(p)(1)(B). Respondent concedes that the judgment of dissolution, which incorporated petitioners' marital agreement, is a domestic relations order.

We find that petitioners' judgment of dissolution does not qualify as a QDRO. The judgment of dissolution did not create or recognize the existence of Mrs. Rodoni's right to receive all or a portion of the benefits payable with respect to Mr. Rodoni under the plan. The marital agreement, which was incorporated into the judgment of dissolution, provided that Mrs. Rodoni was to receive the community property interest in the profit sharing plan, which amount was to be transferred into an IRA in the name of Mrs. Rodoni. This agreement was not executed until well after Mr. Rodoni received his lump-sum distribution from the profit sharing plan, nor was it ever presented to the plan administrator or to the trustee of the profit sharing plan. Mr. Rodoni's interest in the profit sharing plan terminated upon receipt of the balance to the credit of his account; there were no longer any benefits payable from the plan with respect to Mr. Rodoni. Any subsequent court order could not create or recognize rights that no longer existed.

Petitioners argue that because a QDRO creates *or recognizes* an alternate payee's right to plan benefits, such an order need not be entered prior to the distribution from the plan. Petitioners argue that the judgment of dissolution, which incorporated the marital agreement, confirmed or *recognized* Mrs. Rodoni's right to the pension plan benefits. We do not think that Congress intended the QDRO exception[5] to be broad enough to encompass orders entered long after the benefits have been distributed.

---

[5] The QDRO exception was added to the Employee Retirement Income Security Act of 1974, Pub. L. 93–406, 88 Stat. 829 (current version at 29 U.S.C. secs. 1001–1461 (Supp. 1990)) and the Internal Revenue Code by the Retirement Equity Act of 1984, Pub. L. 98–397, 98 Stat. 1426.

Congress clearly intended that the QDRO exception be construed narrowly.[6] As the Senate report states:

> The committee believes that the spendthrift rules should be clarified by creating a *limited exception* that permits benefits under a pension, etc., plan to be divided *under certain circumstances.* In order to provide rational rules for plan administrators, the committee believes it is necessary to establish guidelines for determining whether the exception to the spendthrift rules applies. In addition, the committee believes that conforming changes to the ERISA preemption provision are necessary to ensure that *only those orders that are excepted from the spendthrift provisions* are not preempted by ERISA. [S. Rept. 98–575, at 19 (1984), 1984–2 C.B. 447, 456; emphasis added.]

As is also clear from this report, the requirements governing whether a domestic relations order qualifies as a QDRO were designed to provide guidance to plan administrators. Thus, section 414(p) provides certain procedural rules with respect to domestic relations orders. For example, each plan must establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Sec. 414(p)(6)(B). Also, plan administrators must segregate any benefits to which a domestic order applies while a decision as to the qualified status of the order is pending. Sec. 414(p)(7)(B).

Implicit in these procedural rules, and in their underlying purpose to provide rational rules to guide plan administrators, is the requirement that a domestic relations order be presented to the plan administrator and adjudged "qualified" *before* any distribution is made by the plan to the spouse or former spouse. *Karem v. Commissioner,* 100 T.C. 521, 526 (1993); see *Cummings v. Briggs & Stratton Retirement Plan,* 797 F.2d 383, 389 (7th Cir. 1986).

The terms of Sunset Farms' profit sharing plan also contemplate a determination of an order's qualified status before any benefits are distributed:

16.01 Non-Alienation of Benefits

(a) General. * * * no Participant or Beneficiary shall have the right to alienate, anticipate, commute, pledge, encumber or assign any of the bene-

---

[6] The statutes specifically provide that the exception applies only to "qualified" domestic relations orders. Sec. 401(a)(13)(B); 29 U.S.C. sec. 1056(d)(3)(A).

fits òr payments which he may expect to receive, contingently or otherwise, under this Plan * * *

\* \* \* \* \* \* \*

(c) Qualified Domestic Relations Order. The Plan Administrator and Trustee may comply with a court order which *is determined to be a qualified domestic order,* as defined in IRC section 414(p), including the establishment of a separate account or distribution of benefits, to the extent permitted by applicable law. [Emphasis added.]

Mr. Rodoni's lump-sum distribution does not fall within the QDRO exception provided in section 16.01(c) of the plan, because it was not paid by the plan administrator or trustee in compliance with a court order that was determined to be a qualified domestic relations order.

Furthermore, the judgment fails to qualify as a QDRO, because it fails to clearly specify certain facts as required by section 414(p)(2). In order to constitute a QDRO, a domestic relations order must "clearly specify": (1) The name and last known mailing address of the participant and the alternate payee, (2) the amount or percentage of the participant's benefits to be paid to the alternate payee, (3) the number of payments or period to which such order applies, and (4) each plan to which such order applies. Sec. 414(p)(2)(A)–(D).

The requirement that certain facts be clearly specified serves the purpose of aiding the plan administrator in determining whether a domestic relations order is qualified and thus covered by the limited exception to the antialienation and preemption rules. *Hawkins v. Commissioner,* 102 T.C. 61, 74–75 (1994). Petitioners' judgment of dissolution fails to specify clearly the requisite facts. With respect to the profit sharing plan, the marital agreement provided:

Wife shall receive as her sole and separate share of the community property * * *

The community property interest in Husband's employment related pension and profit sharing plan with Sunset Farms, Inc., which sums shall be transferred into an IRA account in the name of Wife in such a manner as to protect their tax free status as pre taxed deferred compensation. * * *

We will assume that the plan administrator had reason to know the current mailing addresses of Mr. and Mrs. Rodoni so as not to disqualify the order on that ground. See S. Rept. 98–575, *supra* at 20, 1984–2 C.B. at 457. We will also assume that the phrase "Husband's employment related pen-

sion and profit sharing plan with Sunset Farms, Inc." sufficiently identified the plan to which the order applied, since Sunset Farms had only one profit sharing plan. However, the order did not clearly specify the number of payments or period to which it applied, and it did not clearly specify the amount of benefits to be paid. While the phrase "community property interest" may at first blush seem to be a sufficient specification of the amount of benefits to be paid, Mr. Rodoni actually transferred the proceeds from his *entire* interest in the plan to Mrs. Rodoni, and petitioners argue on brief that the order required the transfer of Mr. Rodoni's entire interest rather than just the community property interest. Thus, in the context of this case, the phrase is ambiguous, and the order fails to clearly specify the amount of benefits to be paid.

Petitioners contend that the requirement that certain facts be clearly specified is not to be rigidly applied, especially in the context of a closely held business, where the participant is an officer, director, or major shareholder of the plan administrator. This Court rejected a similar argument in *Hawkins v. Commissioner, supra* at 75–76. Recognizing an exception to the specification requirement for closely held businesses would directly contradict the plain language of section 414(p)(2) requiring a QDRO to "clearly specify certain facts". As we stated in *Hawkins,* "a QDRO should be 'clear and specific' and not 'left to determination by inference or conjecture.' To allow otherwise would be to spawn again 'a relentless stream of litigation'". *Id.* at 73.

## Doctrine of Substantial Compliance

Petitioners argue in the alternative that because they substantially complied with the provisions of section 402(a)(5) or (6)(F), the series of transfers qualifies as a tax-free rollover.

Where the requirements of a statute relate to the substance or essence of the statute, they must be rigidly observed. *Taylor v. Commissioner,* 67 T.C. 1071, 1077 (1977); *Sperapani v. Commissioner,* 42 T.C. 308, 331 (1964). On the other hand, if the requirements are procedural or directory in that they do not go to the essence of the thing to be done, but rather are given with a view to the orderly conduct of

business, they may be fulfilled by substantial compliance. *Taylor v. Commissioner, supra* at 1077–1078; *Dunavant v. Commissioner,* 63 T.C. 316, 319–320 (1974); *Sperapani v. Commissioner, supra* at 330–331.

First, petitioners argue that the requirements of section 402(a)(5) are merely procedural or directory in that, had Mr. Rodoni rolled over his lump-sum distribution into an IRA in his name, and the judgment of dissolution directed the transfer of the IRA from Mr. Rodoni to Mrs. Rodoni, the transfers would have been tax free pursuant to section 408(d)(6). We disagree.

In enacting subchapter D, Congress has provided a comprehensive and detailed legislative scheme which affords employers and employees substantial tax advantages; however, there are risks when a taxpayer does not precisely follow the detailed requirements. *Orzechowski v. Commissioner,* 69 T.C. 750, 757 (1978), affd. 592 F.2d 677 (2d Cir. 1979); see also *Wood v. Commissioner,* 93 T.C. 114, 119 (1989); *Tassinari v. Commissioner,* T.C. Memo. 1984–445, affd. without published opinion 774 F.2d 1148 (1st Cir. 1985).

As we previously stated, the requirements of section 402(a)(5) were intended to ensure that an employee's benefits will be used for his retirement savings and to provide guidance to plan administrators. We therefore hold that the requirement of section 402(a)(5) that a tax-free rollover to an IRA be to an IRA established for the benefit of the employee who received the distribution is not merely procedural with a view to the orderly conduct of business, but rather it relates to the essence of the statute.

Second, petitioners argue that they substantially complied with the QDRO provisions of section 414(p) and thus qualify for tax-free rollover treatment under section 402(a)(6)(F). We need not address whether all the requirements of section 414(p) go to the essence of the statute or are merely procedural, because we find that the requirements which the judgment of dissolution and marital agreement failed to meet[7]

---

[7] As we previously held, the deficiencies in the judgment of dissolution and marital agreement are (1) the failure to obtain and present the judgment to the plan administrator *before* the distribution from the plan, (2) the failure to clearly specify the number of payments or the period to which the order applied, and (3) the failure to clearly specify the amount of benefits to be paid. See *supra* pp. 35–38.

are substantial and fundamental requirements for a QDRO. *Hawkins v. Commissioner,* 102 T.C. at 76.

Accordingly, we find that petitioners did not comply with the requirements for a tax-free rollover pursuant to section 402(a)(5) or (6)(F), and, therefore, the lump-sum distribution that Mr. Rodoni received from the profit sharing plan in the taxable year 1988 constitutes gross income to him pursuant to section 402(a)(1).

Under section 72(t), a 10-percent tax is imposed on an early distribution[8] from a qualified retirement plan, to the extent that the distribution is includable in gross income. Because Mr. Rodoni received an early distribution that was includable in gross income, he is subject to this tax.

Under section 4980A(a), a 15-percent tax is imposed on excess distributions from a qualified retirement plan. An excess distribution is defined as the aggregate amount of the retirement distributions with respect to any individual during any calendar year to the extent it exceeds $150,000. Sec. 4980A(c)(1). Because Mr. Rodoni's lump-sum distribution exceeded $150,000, he is also subject to this tax, except that he is entitled to an offset for the amount of tax imposed by section 72(t). Sec. 4980A(b).

Under section 4973(a), a 6-percent tax is imposed on excess contributions to an IRA. An excess contribution is defined as an amount contributed to an IRA less any qualified rollovers and less the amount allowable as a deduction under section 219 (i.e., $2,000). Sec. 4973(b)(1). Because Mrs. Rodoni made an excess contribution to her IRA, none of which constituted a qualified rollover, she is subject to this tax.

*Decision will be entered under Rule 155.*

---

[8] An early distribution with respect to a distributee who continues employment with the employer is one made before the employee attains age 59½. See sec. 72(t)(2)(A)(i). Mr. Rodoni was 49 years of age at the time of the distribution from the profit sharing plan.