T.C. Memo. 1997-20


UNITED STATES TAX COURT



JERRY L. BURTON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6115-95.                    Filed January 13, 1997.



        P received a lump-sum distribution from two
accounts under a qualified pension plan in 1991.
Pursuant to a divorce decree entered shortly
thereafter, part of the distribution was used to pay
off the mortgage on P's former residence and to pay his
ex-wife $30,000.  P reported the distribution as income
on his 1991 Federal income tax return, but included the
amount used to satisfy his mortgage obligation and the
amount paid to his ex-wife as part of an alimony
deduction.  R disallowed the alimony deduction and
determined that P is taxable on the entire
distribution.  P contends that he is not liable for tax
on the portion of the distribution paid to his former
wife and the portion used to satisfy the mortgage
because the payments were made pursuant to a qualified
domestic relations order (QDRO), as defined by sec.
414(p), I.R.C.  <u>Held</u>:  The divorce decree rendered
after the lump-sum distribution to P does not meet the
requirements of sec. 414(p), I.R.C., and is thus not a

QDRO.  Therefore, P is liable for tax on the entire lump-sum distribution.  Held, further, P is liable for additional tax on the entire lump-sum as a result of the early distribution from a qualified retirement plan pursuant to sec. 72(t), I.R.C.


John L. Onesto, for petitioner.

Donald K. Rogers and Matthew J. Fritz, for respondent.


MEMORANDUM OPINION

NIMS, Judge:*  Respondent determined a deficiency in the 1991 Federal income tax of petitioner Jerry L. Burton in the amount of $53,916, stemming from funds received by petitioner in connection with the closing of his retirement benefits accounts. A petition was filed on April 24, 1995.  An Answer was filed on June 13, 1995.  Respondent thereafter filed an Amendment to Answer, claiming an increased deficiency of $17,676 based upon section 72(t).

Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The sole issue for decision is whether the portion of petitioner's retirement account distribution used to pay off the mortgage on petitioner's former residence and to pay his ex-wife

---

*This case was reassigned to Judge Arthur L. Nims, III, by Order of the Chief Judge.

$30,000 pursuant to their divorce decree constituted taxable income to petitioner in the amount of $156,099.46 for 1991.

This case was submitted to the Court on a full stipulation of facts, which are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioner resided in Jackson, Ohio.

## Background

Petitioner's employment with Fluor Daniel, Inc. (Fluor Daniel) was terminated on March 8, 1991. Petitioner subsequently divorced Linda Gayle Burton (Mrs. Burton) on June 11, 1991; an "Agreed Decree of Divorce" (Decree) was entered with the District Court of Denton County, Texas. The Decree divested petitioner of his entire interest in his former residence located at 2707 Daybreak Drive, Dallas, Texas (2707 Daybreak Drive), and transferred that interest to Mrs. Burton. The Decree also required petitioner to withdraw his entire retirement account balances at Fluor Daniel, use the proceeds to pay off the mortgage on 2707 Daybreak Drive (for which petitioner was personally liable), and pay Mrs. Burton the remaining balance in an amount not to exceed $30,000. The Decree states that petitioner "shall be responsible for all taxes due on the lump sum retirement withdrawal, and releases * * * [Linda] from any and all liability concerning the taxes on the retirement withdrawal."

The Fluor Daniel retirement plan is and was, at the time of petitioner's participation, subject to the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, as amended.  Petitioner had two separate retirement accounts at Fluor Daniel, the "Retirement Plan" and the "Savings Investment Plan."  Sometime in March of 1991, petitioner asked the plan administrator at Fluor Daniel to distribute to him the entire balance of each retirement account. By letters dated May 7 and May 13, 1991, the plan administrator acknowledged petitioner's request and reported to him the amounts to be distributed based on a valuation date of March 31, 1991. As of that date, the combined value of the Retirement Plan and the Savings Investment Plan accounts (plan balance) was $176,754.88.  Petitioner received this sum sometime at the end of May 1991 in the form of two checks dated May 24, 1991 and issued by The Northern Trust Company.  At the time petitioner received the checks, he was under the age of 59-1/2 and did not attain that age at any time during 1991.  The record does not disclose whether petitioner had attained age 55.  See sec. 72(t)(2)(A)(v).

Petitioner paid off his mortgage debt on 2707 Daybreak Drive by wire transfer of $126,099.46 from his account at BancOhio National Bank (BancOhio) to his mortgage account at Bank One Dallas on June 6, 1991.  Furthermore, on or about July 31, 1991,

petitioner sent Mrs. Burton a check drawn on petitioner's account at BancOhio in the amount of $30,000 to fulfill his obligation under the Decree.

On his 1991 Federal income tax return, petitioner reported the plan balance as dividend income of $138,418.91 and capital gain income of $38,335.97. Petitioner also claimed an alimony deduction with respect to both the $30,000 that he paid directly to Mrs. Burton and the $126,099.46 he paid to satisfy the mortgage on 2707 Daybreak Drive. Petitioner included this amount as part of the total alimony deduction of $175,394.07 claimed on the return. The parties have stipulated that petitioner's allowable alimony deduction for the taxable year 1991 was $5,425.

In the Amendment to Answer referred to above, the asserted increased deficiency of $17,676 represents the imposition of additional tax under section 72(t) on petitioner's premature retirement benefits distribution of $176,754.88. Since respondent asserts an increased deficiency, she has the burden of proof on this issue. Rule 142(a). However, the parties stipulated that $20,655.42 of that distribution is taxable income to petitioner. The parties further stipulated that if the Court holds that the total amount of the retirement accounts distribution ($176,754.88) is taxable to petitioner, then petitioner is liable for the additional tax under section 72(t).

## Discussion

We must decide whether the Decree is a qualified domestic relations order (QDRO) within the meaning of section 414(p), thus relieving petitioner of liability for tax pursuant to section 402(a)(9) on the $156,099.46 portion of the lump-sum distribution used to satisfy his mortgage and pay his ex-wife, and the $17,676 additional tax under section 72(t). For the reasons which follow, we hold that the Decree does not constitute a QDRO.

Ordinarily, any funds distributed from an exempt employees' trust (under a tax qualified employees' plan) are taxable to the plan participant or beneficiary who is entitled to receive the distribution under the plan. Darby v. Commissioner, 97 T.C. 51, 58 (1991). However, section 402(a)(9) (now section 402(e)(1)(A)) states an exception to this general rule, providing that an alternate payee (who is the spouse or former spouse of the plan participant) shall be treated as the distributee of any distribution or payment made to such payee under a QDRO. Accordingly, the tax liability for the distribution from the Fluor Daniel retirement accounts will be allocated either to petitioner or to Mrs. Burton depending upon whether the Decree meets the statutory definition of a QDRO.

The Retirement Equity Act of 1984 (REA), Pub. L. 98-397, sec. 204(b), 98 Stat. 1445, added section 414(p), which defines a QDRO. Section 414(p) provides, in pertinent part, the following:

SEC. 414(p). Qualified Domestic Relations Order Defined.--For purposes of this subsection and section 401(a)(13)--

(1) In General.--

(A) Qualified Domestic Relations Order.--The term "qualified domestic relations order" means a domestic relations order--

(i) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(ii) with respect to which the requirements of paragraphs (2) and (3) are met.

(B) Domestic Relations Order.--The term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which --

(i) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(ii) is made pursuant to a State domestic relations law (including a community property law).

(2) Order Must Clearly Specify Certain Facts.--A domestic relations order meets the requirements of this paragraph only if such order clearly specifies--

   (A) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

   (B) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

   (C) the number of payments or period to which such order applies, and

   (D) each plan to which such order applies.

  (3) Order May Not Alter Amount, Form, Etc, Of Benefits.--A domestic relations order meets the requirements of this paragraph only if such order--

   (A) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

   (B) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

   (C) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

Thus, to qualify as a QDRO, a domestic relations order must meet the following tests:  First, it must be a domestic relations order that creates, recognizes, or assigns, to an alternate payee, rights under a qualified employee benefit trust otherwise payable to a plan participant.  Second, the QDRO must clearly specify certain facts, namely, the names and last known mailing addresses of the participant and the alternate payee; the amount

or percentage of the benefits to be paid or the manner in which such amount or percentage is to be determined; the number of payments; and each plan to which the order applies. Third, the QDRO may not alter the amount, form, etc., of the benefits.

Generally, benefits under qualified plans are subject to prohibitions against assignment or alienation (so-called "spendthrift provisions"). S. Rept. 98-575, at 19 (1984), 1984-2 C.B. 447, 456. Before the enactment of section 414(p), the IRS had ruled that the spendthrift provisions are not violated when a plan trustee complies with a court order requiring the distribution of benefits of a participant in "pay status" to the participant's spouse or children in order to meet the participant's alimony or child support obligations, but the IRS had taken no position with respect to this issue in cases in which the participant's benefits are not in pay status. The Senate report indicates that section 414(p) was enacted "to provide rational rules for plan [administrators]". Id. Congress believed it necessary to establish guidelines for determining whether the exception to the spendthrift rules applies, to ensure that only those domestic relations orders that are excepted from the spendthrift provisions are not preempted by ERISA. Id.

The facts in this case do not comport with the requirements of section 414(p)(1). Petitioner's employment with Fluor Daniel

was terminated on March 8, 1991. During that same month petitioner asked the Fluor Daniel plan administrator to distribute to him--petitioner--the entire plan balance. In mid-May of that year the plan administrator acknowledged petitioner's request and reported to him the amounts to be distributed based upon a March 31 valuation date. Petitioner received two checks, both dated May 24, 1991, which terminated his interest in the plan. It is not clear why the plan administrator agreed to this termination of petitioner's entire interest in the plan; one possibility is that the termination of petitioner's interest was permissible as being related to his separation from service with Fluor Daniel. In any event, since the plan proceeds were distributed to petitioner and not to Mrs. Burton, and in advance of the Decree (which was dated June 11, 1991), it cannot be argued that the distribution was made by the plan administrator to an alternate payee in response to the Decree.

Rodoni v. Commissioner, 105 T.C. 29 (1995), involved a similar situation. The domestic relations order in dispute in that case was not executed until after the taxpayer had received a lump-sum distribution terminating his interest in a profit sharing plan. We held that the domestic relations order in that case could not create or recognize rights that no longer existed at the time of the order. Id. at 35. The same is true in this

case.  See also to the same effect <u>Karem v. Commissioner</u>, 100 T.C. 521 (1993).

Nowhere is there any indication that the Decree was presented to the plan administrator, even in draft form, prior to the distribution of the plan proceeds to petitioner.  We have stated, in <u>Rodoni v. Commissioner</u>, <u>supra</u> at 36, that implicit in the procedural rules relating to employee benefit plan provisions (contained in sections 414(p)(6)(B) and 414(p)(7)(B)) is the requirement that a domestic relations order be presented to the plan administrator and adjudged "qualified" before any distribution is made by the plan to the spouse or former spouse. There is no evidence that this occurred in the case before us.

For the foregoing reasons, we hold that the Decree did not effectively create or recognize Mrs. Burton's right as an alternate payee, within the meaning of section 414(p), to receive petitioner's qualified plan benefits.  The directions in the Decree to turn over the disputed part of the plan proceeds could only have been effectively addressed to petitioner, who already had the proceeds, and not to the plan administrator.  As a consequence of this holding, the total amount of the plan distribution to petitioner is taxable to him in 1991.

Having so held, we do not reach the question of whether the Decree clearly specifies facts as required by section 414(p)(2), or alters the amount, form, etc., of the benefits, as prohibited by section 414(p)(3).

In Hawkins v. Commissioner, 86 F.3d 982 (10th Cir. 1996), the Court of Appeals disagreed with our holding in Hawkins v. Commissioner, 102 T.C. 61 (1994), that the domestic relations order in that case did not create or recognize the existence of an alternate payee's right, or assign to an alternate payee the right, to receive employee plan benefits, and did not satisfy the clearly specified facts requirement of section 414(p)(2). However, in that case the disputed domestic relations order preceded the plan distribution, which makes this case distinguishable from Hawkins in a way that is fatal to petitioner's position. The Court of Appeals in Hawkins v. Commissioner, 86 F.3d at 990-991, itself recognized a similar disabling distinction under the facts of Karem v. Commissioner, 100 T.C. 521, 523 (1993):

> In Karem [v. Commissioner, 100 T.C. 521 (1993)], a consent judgment was entered by a state divorce court in order to partition the community property of Mr. and Mrs. Karem. 100 T.C. at 523. The consent judgment provided that Mrs. Karem was to receive an interest in her ex-husband's pension plan, but it stated the following condition:
>
> > "She shall receive that interest pursuant to a qualified Domestic Relations Order to be prepared by Robert Louis Karem. Until the Qualified Domestic

Relations Order is completed, Robert Louis Karem shall pay Barbara Wiechman Karem her interest in the pension plan immediately when he receives it."

Id.  After being assessed a deficiency in his gross income based on a lump-sum plan distribution paid to Mrs. Karem, Mr. Karem filed a petition in the Tax Court arguing that the consent judgment was a QDRO.  The court rejected this argument, noting that "the consent judgment directs that a QDRO be drafted * * *; the consent judgment itself is not a QDRO."  Id. at 525-526 * * *.

The Court of Appeals went on to observe that there was thus no written order in existence at the time of the distribution that would satisfy the requirements of section 414(p).  Hawkins v. Commissioner, supra at 991.

On brief petitioner argues that he received the plan benefits as agent for Mrs. Burton.  However, since the Decree did not qualify as a QDRO, the possibility raised by this argument becomes moot.

As noted above, the parties stipulated that if the Court holds that the total amount of the retirement accounts distribution is taxable to petitioner, then petitioner is also liable for the additional tax under section 72(t).  Consistent with this stipulation, we so hold.

Decision will be entered

for respondent.