T.C. Memo. 2007-333

UNITED STATES TAX COURT

JEANNE E. AMARASINGHE, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

DISAMODHA C. AMARASINGHE AND NARLIE AMARASINGHE, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 14062-06, 15883-06.     Filed November 6, 2007.

P-H failed to pay child support and alimony to P-W as required by their divorce agreement. P-W obtained an order from a domestic relations court demanding that P-H withdraw all funds from his profit sharing plan (the Plan) and pay them to P-W to satisfy his delinquent child support and alimony obligations. P-H complied.

On his 2002 income tax return, P-H reported the distribution from the Plan as income and took a deduction for alimony paid. P-H then filed an amended return taking the position that the distribution from the Plan was made under a qualified domestic relations order (QDRO), and therefore under sec. 402(e)(1)(A), I.R.C., was taxable income to P-W and not P-H. P-H also removed the alimony deduction. P-W reported a

portion of the funds she received as alimony on her 2002 income tax return but did not report any of the funds as pension income.

R rejected P-H's amended return, disallowed part of the alimony deduction taken on the original return, and determined a deficiency in his income tax for 2002. R also determined a deficiency in P-W's income tax for 2002 for failing to report the entire distribution from the plan as income.

P-W moves for an award of litigation costs.

Held: The domestic relations court order did not give P-W the right to receive the distribution directly from the Plan; thus, the court order was not a QDRO under sec. 414(p)(1), I.R.C. Consequently, the distribution was not made under a QDRO, so the exception in sec. 402(e)(1), I.R.C., does not apply, and P-H must include the distribution in his gross income.

Held, further, P-W's original calculation that $75,318 of the distribution was allocable to alimony was correct, so that amount is income to P-W and is deductible by P-H.

Held, further, P-W may not recover litigation costs from P-H under sec. 7430, I.R.C.

Mark E. Slaughter, for petitioner Jeanne E. Amarasinghe.

Disamodha C. Amarasinghe and Narlie Amarasinghe, pro sese.

Veena Luthra, for respondent.

MEMORANDUM OPINION

GOEKE, Judge: By separate notices of deficiency, respondent determined a deficiency of $12,085 in petitioners Disamodha and Narlie Amarasinghe's (Dr. Amarasinghe and his spouse) joint

Federal income tax for 2002, and a deficiency of $36,548 in petitioner Jeanne Amarasinghe's (Ms. Amarasinghe) Federal income tax for 2002. Because these cases present common issues of fact and law, they were consolidated for purposes of trial, briefing, and opinion. Rule 141(a).[1] There are three issues for decision:

(1) Whether the distribution from Dr. Amarasinghe's profit sharing plan was made pursuant to a qualified domestic relations order (QDRO) and therefore was taxable income to Ms. Amarasinghe instead of Dr. Amarasinghe. We hold that it was not.

(2) If the distribution was not made pursuant to a QDRO, what portion of the distribution was alimony and therefore income to Ms. Amarasinghe and deductible by Dr. Amarasinghe. We hold that $75,318 of the distribution was attributable to alimony.

(3) Whether Ms. Amarasinghe is entitled to an award of litigation expenses from Dr. Amarasinghe. We hold that she is not.

### Background

The parties fully stipulated the facts in these cases pursuant to Rule 122. The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

---

[1] Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1986, in effect for the year in issue.

At the time they filed their separate petitions, petitioners resided in Virginia.

Dr. Amarasinghe and Ms. Amarasinghe married in 1970 and divorced in 1993. At the time of their divorce, they had three children under the age of 18. In the Final and Permanent Separation, Custody, Support and Property Settlement Agreement, Dr. Amarasinghe agreed to pay lump-sum and periodic alimony, child support, health insurance premiums, and automobile insurance premiums to Ms. Amarasinghe.

On August 22, 2002, as a result of Ms. Amarasinghe's petition, the Juvenile and Domestic Relations District Court of the City of Virginia Beach (Virginia Beach district court) found that Dr. Amarasinghe was delinquent in his payments to Ms. Amarasinghe and issued an order (the Order). The Order provided:

> The Respondent [Dr. Amarasinghe] shall cash out and pay over to the Petitioner [Ms. Amarasinghe] immediately ALL funds in the Waddell & Reed Profit Sharing Plan and Trust, approximately $188,000.00, more or less, and said sums shall be deemed sufficient to bring current all the Respondent's * * * [child support and health and automobile insurance premiums] through August 2002 as well as the balance of the lump sum due to the Petitioner in the amount of $24,043.80 * * *.

The portion of the $188,000 not allocated to child support, insurance premiums, and lump-sum spousal support would be deemed sufficient to bring current the periodic spousal support owed.

Subsequent to the entry of the Order, Dr. Amarasinghe instructed Waddell & Reed to transfer the funds from his account

to Ms. Amarasinghe.  However, for reasons not provided in the record, Ms. Amarasinghe never received any funds directly from Waddell & Reed.

As a result, in September of 2002 Ms. Amarasinghe petitioned the Virginia Beach district court to hold Dr. Amarasinghe in contempt for failure to comply with the Order.  According to the petition, Dr. Amarasinghe's delinquent obligations included $71,650 for child support and $32,400 for insurance premiums. Furthermore, Dr. Amarasinghe had not paid the $24,043.80 lump-sum spousal support set forth in the Order or any periodic spousal support.  On October 16, 2002, the Virginia Beach district court held Dr. Amarasinghe in contempt and sentenced him to jail for 10 days.

The same day, Dr. Amarasinghe terminated his interest in the Waddell & Reed Profit Sharing Plan and Trust (the Plan) and requested a rollover of all his funds into an individual retirement account (IRA) in his name that was established by Waddell & Reed.  Dr. Amarasinghe then requested a distribution of all of the funds in his IRA, and Waddell & Reed issued nine checks to Dr. Amarasinghe totaling $179,368.  Dr. Amarasinghe endorsed each of these checks to Ms. Amarasinghe's attorney and delivered them to her.

Dr. Amarasinghe and his spouse filed a joint 2002 Form 1040, U.S. Individual Income Tax Return, in 2003.  On the Form 1040,

they reported $179,368 as taxable income from pensions and annuities, and reported a deduction for alimony paid of $116,350. In 2004, they filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 2002. On the Form 1040X, they removed the $179,368 distribution from pensions and annuities income and the $116,350 deduction for alimony paid.

Ms. Amarasinghe also filed a 2002 Form 1040 in 2003. On her return, Ms. Amarasinghe reported income of $75,318 as alimony received and did not report any income from pensions and annuities.

On May 26, 2006, respondent issued a notice of deficiency to Dr. Amarasinghe and his spouse. Respondent effectively disallowed the Form 1040X amended return and determined that the deduction for alimony paid was limited to $75,318. After adjusting their deductions and credits, respondent determined a deficiency in income tax of $12,085 for 2002.

On May 26, 2006, respondent issued a notice of deficiency to Ms. Amarasinghe. Respondent determined that she received pension income in the amount of $179,368 and that she received no alimony income in 2002. After adjusting her deductions and exemptions, respondent determined a deficiency in income tax of $36,548.

Petitioners timely filed separate petitions with this Court.

## Discussion

### I.   Qualified Domestic Relations Orders

Under sections 401(a) and 402(a), funds distributed from a qualifying profit sharing plan are taxable to the distributee, who is the participant or beneficiary entitled to receive the distribution under the plan.  Darby v. Commissioner, 97 T.C. 51, 58 (1991).  Section 402(e)(1)(A) contains an exception to this rule, and provides: "an alternate payee who is the spouse or former spouse of the participant shall be treated as the distributee of any distribution or payment made to the alternate payee under a qualified domestic relations order (as defined in section 414(p))."  The parties agree that the Plan is a qualifying profit sharing plan under section 401(a) and the Order is a domestic relations order (DRO) under section 414(p)(1)(B).

A DRO qualifies as a QDRO only if it:  (1) Creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan; (2) clearly specifies certain facts; and (3) does not alter the amount or form of the plan benefits.  Sec. 414(p)(1)-(3).  In addition, the DRO must be presented to the plan administrator, who must determine whether it is a QDRO.  Sec. 414(p)(6); Rodoni v. Commissioner, 105 T.C. 29, 35 (1995); Karem v. Commissioner, 100 T.C. 521, 526 (1993).  Finally, under

section 402(e)(1)(A), an alternate payee is treated as the distributee of a distribution from a qualifying plan only if the distribution is made to the alternate payee under a QDRO.

Ms. Amarasinghe and respondent contend that the Order fails to satisfy the requirement of section 414(p)(1)(A)(i) because it does not recognize Ms. Amarasinghe as an alternate payee. The statute defines an "alternate payee" as "any spouse, former spouse, child or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." Sec. 414(p)(8). Specifically, Ms. Amarasinghe and respondent argue that Ms. Amarasinghe is not recognized as an alternate payee because the DRO does not give her an independent right to obtain the funds directly from the Plan, but instead it directs Dr. Amarasinghe to "cash out" and then pay the funds to Ms. Amarasinghe.

The present case is similar to, but distinguishable from, Hawkins v. Commissioner, 102 T.C. 61, 62-63 (1994), revd. 86 F.3d 982 (10th Cir. 1996), where the disputed DRO provided: "Wife shall receive as her separate property: a) Cash of One Million Dollars ($1,000,000) from Husband's share of the Arthur C. Hawkins, DDS Pension Plan." In interpreting the statute, the Tax Court stated that because section 414(p) "allows parties to a marital settlement agreement to allocate the tax burdens between

them by the use of particular language, the intentions of the parties are not controlling." Id. at 70 (citing Commissioner v. Lester, 366 U.S. 299, 304-305 (1961)). The Court compared the QDRO provisions to the child support language in section 71(c) at issue in Lester, and concluded that "a QDRO should be 'clear and specific' and not 'left to determination by inference or conjecture.'" Id. at 73 (quoting Commissioner v. Lester, supra at 306). With these considerations in mind, the Court held that the DRO was not a QDRO, in part because on its face it did not create, recognize, or assign rights in the pension plan to Mrs. Hawkins. Id. at 74. The Court concluded that identifying the pension plan as the source of the $1 million payable to Mrs. Hawkins was not a sufficient indication that she was an alternate payee. Id. The Court noted that there were no clear signs that a QDRO was intended, such as references to Mrs. Hawkins as the alternate payee or as the person responsible for the taxes on the distribution. Id.

Mr. Hawkins appealed the Court's decision to the Court of Appeals for the Tenth Circuit, which reversed this Court's ruling. Hawkins v. Commissioner, 86 F.3d 982 (10th Cir. 1996), revg. 102 T.C. 61 (1994). The Court of Appeals held that the use of the phrase "$1 million 'from' * * * [the pension plan]" sufficiently created or recognized the contractual right in Mrs. Hawkins required by section 414(p)(1)(A)(i). Id. at 990. The

Court of Appeals decided that based on the legislative history of the statute, the Court's reading of section 414(p) was too narrow and would make it unreasonably difficult for DROs to qualify as QDROs. Id. at 991. Dr. Amarasinghe argues that the Court of Appeals' interpretation of section 414(p)(1)(A)(i) supports his argument that the Order is a QDRO because, like the DRO in Hawkins, the Order specifies the Plan as the source of the funds that Dr. Amarasinghe must pay to Ms. Amarasinghe.

Ms. Amarasinghe and respondent argue, and we agree, that the case before us is distinguishable from Hawkins v. Commissioner, supra, because in the case before us the Order did not give Ms. Amarasinghe a direct right to receive the distribution, but instead required Dr. Amarasinghe to "cash out" first. In Hawkins, the DRO at issue allowed the former spouse to receive payments directly from the plan. Hawkins v. Commissioner, 102 T.C. at 63.

A DRO fails to meet the requirements of section 414(p)(1)(A)(i) if it does not create or recognize in the alternate payee the right to receive benefits directly from a qualifying plan. Dr. Amarasinghe argues that the Order is a QDRO because the "end result" it required was that Ms. Amarasinghe receive funds originating from the Plan. However, this argument urges us to ignore the statutory requirement that to be qualified, a DRO must create or recognize in an alternate payee

"the right to * * * receive all or a portion of the benefits payable with respect to a participant under a plan".  Sec. 414(p)(1)(A)(i).  A DRO that allows or orders the plan participant to withdraw funds from the plan and then pay them to a payee only gives the payee a right to funds held <u>by the plan participant</u>, not to benefits from a qualifying plan.  To allow such a DRO to qualify as a QDRO would be to ignore the plain meaning of section 414(p).

Our reading of section 414(p)(1)(A)(i) comports with our earlier decisions,[2] the legislative history of the statute, and section 402(e)(1)(A).  The Senate report states that Congress intended section 414(p) to provide a "limited exception" to the spendthrift provisions of the Internal Revenue Code that would apply "under certain circumstances * * * In order to provide rational rules for plan administrators".  S. Rept. 98-575, at 19 (1984), 1984-2 C.B. at 456.  We believe that Congress intended that section 414(p) should be read narrowly so that plan administrators can easily identify DROs as QDROs and accordingly make distributions directly to the alternate payees as required by the QDROs, which will prevent plan participants from

---

[2] See <u>Karem v. Commissioner</u>, 100 T.C. 521, 526 (1993) (holding that a consent judgment was not a QDRO in part because the distribution was paid to the plan participant and not to his former spouse); <u>Bougas v. Commissioner</u>, T.C. Memo. 2003-194 (noting that a QDRO should specify an amount to be paid by the plan to an alternate payee).

dissipating the benefits before they reach the alternate payees. To accept as a QDRO a DRO that allows the plan administrator to shift the payment responsibility to the plan participant would violate the purpose of section 414(p).

Even if the Order qualified as a QDRO on its face, we find that the exception in section 402(e)(2) does not apply because the procedural requirements of section 414(p)(6) were not satisfied. Section 414(p)(6) provides the procedures for determining whether a DRO meets the standards of a QDRO, and it states that "the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders," and "within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination."

This Court has consistently held this subsection to mean that to qualify as a QDRO, a DRO must "be presented to the plan administrator and adjudged 'qualified' before any distribution is made by the plan to the spouse or former spouse." Karem v. Commissioner, 100 T.C. at 526; see also Rodoni v. Commissioner, 105 T.C. at 35. This reduces any ambiguity as to whether a distribution is made pursuant to a QDRO.

If no plan administrator is specifically designated,[3] and the plan is not maintained by an employer, an employee organization, or a group representing the parties, then the default rule is that the person in control of the assets is the plan administrator.  Sec. 414(g); sec. 1.414(g)-1(b), Income Tax Regs.  In this case, the default plan administrator would be Waddell & Reed as the person in control of the Plan's assets.

There is no evidence that Waddell & Reed received a copy of the Order or that Waddell & Reed made a determination that it was a QDRO.  Therefore, we find that the Order fails the procedural requirements of section 414(p).

Additionally, when the distribution is actually made, section 402(e)(1)(A) requires that it be made directly to the alternate payee to qualify for the exception to section 402(a) by requiring that the distribution be "made <u>to</u> the alternate payee under a * * * [QDRO]".  (Emphasis added.)  See <u>Burton v. Commissioner</u>, T.C. Memo. 1997-20 (noting that in part because the distribution was made to the plan participant and not his former spouse, it was not "made by the plan administrator to an alternate payee in response to the Decree").

---

[3]  Dr. Amarasinghe asserts on brief that he was designated as the plan administrator for the Plan.  However, under Rule 143(b), statements in briefs are not evidence.

In this case, Waddell & Reed distributed the Plan funds to Dr. Amarasinghe, not Ms. Amarasinghe, and the fact that Ms. Amarasinghe ultimately received the funds from the distribution is not dispositive.  Therefore, we conclude that the distribution from the Plan was not made pursuant to a QDRO under section 402(e)(1)(A) because the Order failed to give Ms. Amarasinghe the right to receive the benefits directly from the Plan, the procedural requirements of section 414(p)(6) were not satisfied, and Ms. Amarasinghe did not in fact receive the benefits directly from the Plan.[4]

## II.  Alimony

The parties agree that a portion of the distribution should be alimony.  The amount Ms. Amarasinghe reported as alimony on her 2002 Federal income tax return is $75,318, calculated by beginning with the $179,368 that Ms. Amarasinghe received from Dr. Amarasinghe, and subtracting $104,050 as the amount Ms. Amarasinghe allocated to child support and insurance premiums in her petition to the Virginia Beach district court.

Ms. Amarasinghe now asks us to consider an alternative method that she claims to be simpler and more accurate.  She argues that we should begin with $109,200 as the total amount of

---

[4] Ms. Amarasinghe and respondent contend that the Order is not a QDRO because it also fails to satisfy the fact specification requirements of sec. 414(p)(1)(A)(ii).  However, we need not address this issue.

delinquent periodic alimony stated in her petition to the Virginia Beach District court, subtract $71,843 as the amount of periodic alimony that Ms. Amarasinghe waived according to the Order, and add the result to the lump-sum spousal support of $24,043.80. Under this calculation, $61,400.80 of the distribution would be alimony.

The Order provides that the distribution would first bring current Dr. Amarasinghe's payments for child support, insurance premiums,[5] and lump-sum alimony, and the remainder would bring current Dr. Amarasinghe's periodic alimony payments. We find that Ms. Amarasinghe's original calculation mirrors this intention because it first accounts for child support, insurance premiums, and lump-sum alimony, and allocates the remaining distribution to periodic alimony. By contrast, Ms. Amarasinghe's alternative first accounts for the lump-sum alimony and alimony not waived; therefore more of the distribution is allocated to child support and insurance premiums than necessary to bring those obligations current, which would require Ms. Amarasinghe to waive more of her periodic alimony than is necessary. Because we find that Ms. Amarasinghe's original calculation reflects the allocation made in the Order and makes no unnecessary allocations, we conclude that Dr. Amarasinghe may deduct $75,318

---

[5] The parties agree that the insurance premiums constitute child support.

of the distribution under section 215(a), and Ms. Amarasinghe must include $75,318 of the distribution as gross income under section 71(a).

## III. Litigation Costs

Ms. Amarasinghe seeks to recover reasonable litigation costs from Dr. Amarasinghe and his spouse.  Ms. Amarasinghe did not raise the issue in a proper motion for litigation and administrative costs under Rule 231, and therefore her claim is premature.  Even if Ms. Amarasinghe were to raise the issue in accordance with Rule 231, she would not be entitled to costs from Dr. Amarasinghe and his spouse because section 7430 does not allow a petitioner to recover costs from another petitioner. Sec. 7430(b)(2).

## IV. Conclusion

On the record before us, we find that (1) the distribution from the Plan was not made pursuant to a QDRO, (2) the parties' determination of the amount of alimony as $75,318 is correct, and (3) Ms. Amarasinghe is not entitled to litigation costs.

To reflect the foregoing,

Decision will be entered
for petitioner in docket No.
14062-06.

Decision will be entered
for respondent in docket No.
15883-06.
